Maria SHARPE, as natural parent and next of kin of Joel Wesley Sharpe,

v.

CITY OF LEWISBURG, TENNESSEE, et al.

No. 1–85–0099.

United States District Court, M.D. Tennessee, Columbia Division.

Jan. 26, 1988.

## AMENDED MEMORANDUM

WISEMAN, Chief Judge.

■ This case presents a question of first impression in the Sixth Circuit. That question is: Is the loss of society and companionship by a mother of her unconstitutionally killed son compensable under 42 U.S.C. § 1983? This Court finds that it is.

### Factual Background

On Sunday morning, June 9, 1985, the Lewisburg Police Department received a call from a neighbor of Joel Wesley Sharpe. The neighbor informed the police that Sharpe was armed with a knife and had his mother pinned to the ground. Officer Harris was dispatched to the scene. Before any officers arrived, Sharpe and his mother walked across the street to the home of a neighbor and the mother entered the neighbor's home. Sharpe, who still had the knife in his hand, did not enter the home but walked up the street. He stopped at the home of another neighbor who was in his car preparing to leave. With the knife visible, Sharpe demanded the neighbor's car and threatened him. The neighbor refused, and Sharpe beat his own head on the back of the car before leaving and walking on up the street. Another witness who approached Sharpe standing in the middle of the road with knife in hand stopped his car, and Sharpe said something to him about a little green bug.

A second police officer, defendant Duckworth, was dispatched to the scene. Both officers, Harris and Duckworth, arrived simultaneously. Duckworth got out of his car and approached Sharpe, who was standing in the road waving the knife. Duckworth drew his revolver. Both officers tried to talk to Sharpe and asked him to put down the knife but received no response. Duckworth called the Sheriff's Department for backup and called for a firetruck with the idea that a fire hose might be used to disarm Sharpe. An ambulance was also called.

In response to the backup call, Deputies Green and Campbell arrived on the scene. Two firetrucks then arrived and Captain Blankenship also arrived. There were now

Walter W. Bussart, Fred D. Thompson, Thompson & Bussart, Nashville, Tenn., R. Stephen Doughty, for plaintiff.

Knox Bigham, Michael M. Boyd, Bigham & Boyd, and Robert O. Binkley, Lewisburg, Tenn., for defendants.

two city patrol cars, Captain Blankenship's car, a sheriff's patrol car, two firetrucks, and an ambulance at the scene. The firemen began laying out the hose. A crowd of bystanders aggregated.

The timing of various actions becomes confused at this point, but Officer Campbell testified that Sharpe appeared to be starting toward him with knife raised, and when Sharpe refused to stop, Campbell shot him in the leg. Sharpe then turned and started in the other direction. Campbell shot again. Green and Duckworth then shot several times. One of the shots knocked the knife from Sharpe's hand and the officers then threw Sharpe to the ground and handcuffed him. Maria Sharpe arrived on the scene toward the end of the shooting. Sharpe died from the entry of eight bullets in various parts of his body.

Maria Sharpe, as mother and next of kin and in her own behalf, sued the City of Lewisburg, Police Chief Ray Green, City Officers Duckworth, Blankenship, and Harris, Marshall County, Sheriff Carlton Bless, and Sheriff Deputies Jerry Campbell and Jack Green, for the wrongful death and loss of society and companionship of Sharpe under both 42 U.S.C. § 1983 and pendent state law. Plaintiff alleged that the officers used excessive force; that the city and county were grossly negligent and negligent in failing to train and supervise; and that the Sheriff, Police Chief and Captain Blankenship were all grossly negligent and negligent.

At the conclusion of all the evidence, the Court granted a motion for a directed verdict in favor of Officer Harris. A motion for a directed verdict as to the other defendants was denied but the Court, noting the novelty of the claim for loss of society and companionship, charged the jury on this issue and suggested to counsel that a Motion for Judgment Notwithstanding the Verdict would be an appropriate way to challenge the result if the jury found in plaintiff Maria Sharpe's favor.

Special interrogatories were submitted to the jury. These interrogatories and answers were as follows:

1. Did the following officers deprive Joel Sharpe of his Constitutional rights by using excessive force in shooting him?

| | | |
|---|---|---|
| Jerry Campbell | X Yes | No |
| Billy Duckworth | X Yes | No |
| Jack Lee Green | X Yes | No |

(If you answered "yes" for any defendant listed in Question 1, go on to Question 2. If you answered "no" for each defendant listed in Question 1, go no further, sign the verdict form, and return to the courtroom.)

2(a). Was Captain Charlie Blankenship grossly negligent or reckless in failing to supervise officers at the scene of the incident?

___Yes    X No

(If you answered "yes" to Question 2(a), answer Question 2(b). If you answered "no" to Question 2(a), omit Question 2(b) and go on to Question 3.)

2(b). Were Chief Ray Green and the City of Lewisburg grossly negligent or reckless in failing to prevent Captain Blankenship's lack of supervision of officers at the scene of the incident?

___Yes    ___No

3(a). Was Captain Charlie Blankenship negligent in failing to supervise officers at the scene of the incident?

X Yes    ___No

(If you answered "yes" to Question 3(a), answer Question 3(b). If you answered "no" to Question 3(a), omit Question 3(b) and go on to Question 4.)

3(b). Was Chief Ray Green negligent in failing to prevent Captain Blankenship's lack of supervision of officers at the scene of the incident?

X Yes    ___No

(If you answered "yes" to Question 1 for Billy Duckworth, answer Question 4. If you answered "no" for Billy Duckworth, omit both parts of Question 4 and go on to Question 5.)

4(a). Were Chief Ray Green and the City of Lewisburg grossly negligent or reckless in failing to train their officers in the appropriate use of force?

X Yes    ___No

4(b). Was Chief Ray Green negligent in failing to train his officers in the appropriate use of force?

   X Yes    ___No

(If you answered "yes" in Question 1 for either Jerry Campbell or Jack Lee Green, answer Question 5. If you answered "no" for both Deputies Campbell and Green, omit both parts of Question 5 and go on to Question 6.)

5(a). Were Sheriff Carlton Bless and Marshall County grossly negligent or reckless in failing to train their deputies in the appropriate use of force?

   X Yes    ___No

5(b). Was Sheriff Carlton Bless negligent in failing to train his deputies in the appropriate use of force?

   X Yes    ___No

6. We, the jury, award damages as follows:

   a. $100,000.00 for pain and suffering of Joel Sharpe between the time of his injury and his death.

   b. $ 560.91 for medical expenses.

   c. $ 3,778.30 for funeral expenses.

   d. $250,000.00 for the pecuniary value of the life of Joel Sharpe.

   e. $150,000.00 for the permanent loss of society and companionship suffered by Maria Sharpe as a result of the death of Joel Sharpe.

The jury was instructed on the issue of punitive damages but did not award them against any of the defendants.

Before the Court now are defendants' Motion for a New Trial, Motion for Judgment Notwithstanding the Verdict, and Plaintiff's Motion for Attorneys' Fees. The Court has previously held a hearing on the Motion for a New Trial alleging juror misconduct and denied it. The other motions were taken under advisement, and the Court now proceeds to address them.

### Motion for a New Trial

Defendants' motion contains six grounds. Ground 5, relating to juror misconduct, has been denied. Ground 4 addresses the loss of society and companionship issue and will be discussed under the Motion for Judgment Notwithstanding the Verdict.

■ Ground 1 asserts that the verdict is against the weight of the evidence. The evidence was disputed and yielded variant inferences. A jury question was made on all issues and the verdict of the jury was supported by the evidence. This motion is denied.

■ Ground 2 asserts that the award of damages is excessive and against the weight of the evidence. The jury broke the damages down into five components in answer to the special interrogatories. The award of $100,000 for pain and suffering is excessive. The deceased, though still conscious when placed in the ambulance, was dead on arrival at the hospital. He could not have lived more than a few minutes from the time of injury until death. Unless the plaintiff accepts a remittitur of $75,000 to an award of $25,000 for pain and suffering, a New Trial will be ordered. The award for medical expenses and funeral expenses is fully supported by the evidence. The award of $250,000 for the pecuniary value of the life of the deceased is excessive. Sharpe was an emotionally disturbed 20–year old who had worked only sporadically for minimum wages. Although the actuarial tables gave him a long work-life expectancy, his prior work record, education, and mental problems must be considered along with the actuarial expectation. Unless the plaintiff accepts a remittitur of $100,000 to an award of $150,-000 for the pecuniary value of the life of the deceased after consideration of his own living expenses, a New Trial will be ordered. The award of $150,000 for loss of society and companionship by Maria Sharpe is not excessive, and if her separate cause of action is cognizable, as discussed under the Motion for Judgment Notwithstanding the Verdict, it is recoverable.

■ Ground 3 is denied. The evidence of Captain Blankenship's alcoholism and prior misconduct was relevant and material to the issue of his liability. It was not more prejudicial than probative.

Ground 6 is denied for the reasons stated from the bench at the time the evidence was viewed out of the presence of the jury.

### Motion for Judgment Notwithstanding the Verdict

The Motion for Judgment Notwithstanding the Verdict raises the very difficult and novel question posed at the outset of this opinion. To determine whether a mother's loss of the society and companionship of her emotionally disturbed son, who was killed by police officers' use of excessive force, is compensable under 42 U.S.C. § 1983, the Court must address two questions. First, we must decide whether a cause of action exists under section 1983 because (1) the mother had a constitutionally protected liberty interest in her relationship with her son; and (2) the severance of that relationship through an unjustified shooting constituted a deprivation of that interest. Second, if a cause of action exists, we must determine what damages are available to the mother given the restrictions of state tort law.

The language of section 1983 reveals that deprivation of a federally protected right is essential to a plaintiff's success. The statute provides in pertinent part as follows:

> § 1983—Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the *deprivation of any rights, privileges, or immunities secured by the Constitution and laws*, shall be liable to the party injured in an action at law.... (emphasis added)

On similar facts, the Supreme Court has declined to address whether a liberty interest exists in *Jones v. Hildebrant*, 432 U.S. 183, 97 S.Ct. 2283, 53 L.Ed.2d 209 (1977). In that case, a Colorado mother sued in state court for the death of her 15–year–old son at the hands of a Denver police officer. She asserted claims under the Colorado wrongful death statute and a section 1983 claim for intentional deprivation of her own liberty interest in the continued association of her son. The trial court dismissed the section 1983 claim, affirmed by the Colorado Supreme Court, ruling that the section 1983 claim was merged into the wrongful death action upon which there was a statutory limitation of $45,000 in damages. The United States Supreme Court first granted certiorari on the question of whether a state's limitation on damages in a wrongful death action would control in an action brought under section 1983. The writ was dismissed as improvidently granted, the Court holding that the "question of whether she was deprived of a constitutional liberty interest of her own was neither alleged in her complaint in the Colorado trial court, presented in the petition for certiorari in this Court, nor fairly subsumed in the question that was presented." *Id.* at 189, 97 S.Ct. at 2287. In this case, however, the question was squarely presented in the pleadings, supported by proof, submitted to the jury, and relied upon in the jury's findings. Hence, it must be addressed.

The Supreme Court not only refused to identify the precise interest which is at the heart of the case before this Court; it also suggested that the state's limitation on damages was not controlling in a cause of action arising under section 1983.

> Whatever the merits of her constitutional liberty claim in her own right, *a question or which we do not intimate an opinion*, it would not seem logically to be subject to a damages limitation contained in the statute permitting survivors to recover for wrongs done to a property interest of theirs.

*Id.* at 188, 97 S.Ct. at 2287. (emphasis added)

The Court has recognized that certain family relationships give rise to a Constitutionally protected liberty interest. In *Roberts v. U.S. Jaycees*, 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984), the Court observed:

> The Court has long recognized that, because the Bill of Rights is designed to secure individual liberty, it must afford the formation and preservation of certain kinds of highly personal relationships a substantial measure of sanctuary from unjustified interference by the State. Without precisely identifying every consideration that may underlie this type of constitutional protection, we have noted that certain kinds of personal bonds have

played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideals and beliefs; they thereby foster diversity and act as critical buffers between the individual and the power of the State. Moreover, the constitutional shelter afforded such relationships reflects the realization that individuals draw much of their emotional enrichment from close ties with others. Protecting these relationships from unwarranted state interference therefore safeguards the ability independently to define one's identity that is central to any concept of liberty.

The personal affiliations that exemplify these considerations, and that therefore suggest some relevant limitations on the relationships that might be entitled to this sort of constitutional protection, are those that attend the creation and sustenance of a family-marriage, *e.g.*, *Zablocki v. Redhail*, [434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978)], childbirth, *e.g.*, *Carey v. Population Services International*, [431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977)]; the raising and education of children, *e.g.*, *Smith v. Organization of Foster Families* [431 U.S. 816, 844, 97 S.Ct. 2010, 2015–2016, 52 L.Ed.2d 675 (1977)], and cohabitation with one's relatives, *e.g.*, *Moore v. East Cleveland* [431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977)]. Family relationships, by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences and beliefs but also distinctively personal aspects of one's life. Among other things, therefore, they are distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship. As a general matter, only relationships with these sorts of qualities are likely to reflect the considerations that have led to an understanding of freedom of association as an intrinsic element of personal liberty.

*Id.* at 618–620, 104 S.Ct. at 3250–3251. (citations omitted)

The rationale of *Roberts* was applied to support a parents' section 1983 action against police officers for the companionship and support of their 18–year–old son in *Myres v. Rask*, 602 F.Supp. 210, 213 (E.D.Colo.1985).

It would be ironic indeed to recognize, on the one hand, the constitutional rights to marry, to procreate, to supervise the upbringing of children, to retain custody of one's illegitimate children, and to live in the same residence with one's "family," but on the other hand, to deny parents constitutional protection for the continued life of their child (citations omitted). State action that wrongfully kills one's child certainly interferes with fruition and fulfillment of the fundamental right to procreate. A parent cannot benefit from his constitutionally protected rights to supervise the upbringing, retain custody, or live in the same residence with a child if state action unlawfully takes the child's life. To constitutionally protect families from lesser intrusions into family life, yet allow the state to destroy the family relationship altogether, would drastically distort the concept of ordered liberty protected by the Due Process Clause.

Similar reasoning supports a finding that a liberty interest exists in a mother's relationship with her emotionally disturbed 20–year–old son who lives with her.

The next issue the Court must address is whether the police officers' actions resulted in a deprivation of the mother's liberty interest. Clearly, the jury found that the officers used excessive force when they shot Joel Sharpe and that the gross negligence of the Police Chief and the City of Lewisburg created a situation in which it was likely that such force could be used. Plaintiff's theory and the proof at trial revealed that the authorities failed to train officers to deal with mentally disturbed persons. People like Mr. Sharpe "associate" with those on whom they are uniquely and essentially dependent. Disruption of that relationship is highly predictable, if not inevitable, when the State fails to consider their special vulnerabilities in training those who will be called upon to deal with

them. The jury found that policymakers like the Police Chief, the Sheriff, the City, and the County were so grossly negligent or reckless that future misconduct by the officers was almost inevitable or would properly be characterized as substantially certain to result. When officials act not with mere negligence but with deliberateness, they deprive a plaintiff of Fourteenth Amendment due process rights. *See Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). The Court believes that these officials' gross negligence rises to the level of deliberate action because, as policymakers, they had time to entertain the statistical likelihood that lives were very likely to be lost and that constitutionally protected relationships would be severed. Hence, these policymakers—the Police Chief, the Sheriff, the City, and the County—are liable to Sharpe's mother for depriving her of liberty interest in the society and companionship of her son. Defendants Campbell, Duckworth, Jack Green, and Blankenship, however, are liable to Sharpe's mother only for those damages proximately caused by their use of excessive force.

In determining damages, the Court must now consider a choice of law question: whether to apply the common law of damages under the guidance of *Smith v. Wade*, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983), or to find federal law deficient such that Tennessee state law will apply under 42 U.S.C. § 1988. One scholar has observed that there is no clear dichotomy between issues that should be resolved by interpreting section 1983 with common law and those that should be resolved pursuant to section 1988 under the forum state's law. M.A. Schwartz & J.E. Kirklin, *Section 1983 Litigation: Claims, Defenses, and Fees* § 10.1 at 214 (1986). To determine whether a cause of action under section 1983 survives the death of a plaintiff, the Supreme Court has applied state law under section 1988, *Robertson v. Wegmann*, 436 U.S. 584, 98 S.Ct. 1991, 56 L.Ed.2d 554 (1978), but to determine whether punitive damages were available in section 1983 actions, the Court consulted the common law of torts, *Smith v. Wade*, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). *See* Schwartz at 214–215, *citing McFadden v. Sanchez*, 710 F.2d 907, 912–13 (2d Cir.1983).

Because the instant case concerns recovery of damages under section 1983, it seems appropriate to follow the teaching of *Smith* and to consult the common law as an appropriate starting point for the inquiry into damages for loss of society and companionship.[1] A court should consider

---

1. Analysis under section 1988 would lead to the same result: inquiry into common law as a means of construing section 1983. Section 1988 requires a three-part test that: (1) asks whether federal law is deficient; (2) borrows state law; and (3) determines whether state law is inconsistent with federal policy. The Supreme Court emphasized the predominance of federal interests in *Wilson v. Garcia*, 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985).

   Our identification of the correct source of law properly begins with the text of § 1988. Congress' first instruction in the statute is that the law to be applied in adjudicating civil rights claims shall be in "conformity with the laws of the United States, so far as such laws are suitable." This mandate implies that resort to state law—the second step in the process—should not be undertaken before principles of federal law are exhausted....

   This interpretation is also supported by Congress' third instruction in § 1988: state law shall only apply "so far as the same is not inconsistent with" federal law. This requirement emphasizes "the predominance of the federal interest" in the borrowing process tak-

   en as a whole. Even when principles of state law are borrowed to assist in the enforcement of this federal remedy, the state rule is adopted as "a federal rule responsive to the need whenever a federal right is impaired." The importation of the policies and purposes of the States on matters of civil rights is not the primary office of the borrowing provision in § 1988. Rather the statute is designed to assure that neutral rules of decision will be available to enforce the civil rights actions, among them § 1983. Congress surely did not intend to assign to state courts and legislatures a conclusive role in the formative function of defining and characterizing the essential elements of a federal cause of action. *Id.* at 268–269 [105 S.Ct. at 1943–1944]. (citations omitted)

   Clearly, a diversity action in which Tennessee law applied would bar recovery of damages for society and companionship. Tennessee law provides that the measure of damages in a wrongful death action includes the pecuniary value of the life of the deceased. Tenn.Code Ann. 20-5-113 (1980). *See also Newman v. Simmons*, 62 Tenn.App. 610, 466 S.W.2d 506,

the present state of damages recoverable in death cases in the several states, rather than the state of the law in 1871, when the Ku Klux Klan Act was enacted. *Smith, supra.* Society and companionship damages are now recoverable in some form in a majority of states. *See* S. Speiser, *Recovery for Wrongful Death 2d* § 3.:49 (2d ed. 1975); *see also, Sea Land Services, Inc. v. Gaudet,* 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1970) (finding society and companionship damages to be the present majority rule and prescribing their availability under general maritime law).

Nor is it a matter of serious concern that such a rule in the Federal courts of Tennessee may cause forum shopping due to a conflict with Tennessee state law. The tort law of Tennessee and the Federal purpose to vindicate constitutional rights address different concerns. *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662. Uniform availability of Federal remedies among the various states is salutary.

Ms. Sharpe had a liberty interest in her continuing relationship with her son, and she was deprived of that interest.[2] Damages for loss of society and companionship are commonly permitted in most states and suit the remedial purposes of section 1983. Further, the measure of damages awarded seems appropriate to the type of constitutional injury suffered. *See Memphis Community School District v. Stachura,* 477 U.S. 299, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986); *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). For all of the foregoing reasons, the Motion for Judgment Notwithstanding the Verdict is denied on the question of the availability of damages for loss of society and companionship.

■ However, since the law on this matter was far from settled or clearly established, defendants Bless and Ray Green are entitled to qualified immunity. *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). This immunity, however, is not available to defendants Marshall County or City of Lewisburg. The Motion for Judgment Notwithstanding the Verdict as to the $150,000 award is therefore granted as to all defendants except the City and County.

### Attorneys' Fees

A hearing on the matter of attorneys' fees will be held on February 9, 1988, at 1:00 p.m.

### ORDER

This Order and the accompanying Amended Memorandum supersedes the Order and Memorandum entered on January 14, 1988. In addition, plaintiff's motion to reconsider and modify the January 14, 1988 Order and Memorandum is hereby denied.

For the reasons stated in the accompanying Amended Memorandum, a new trial will be ordered unless the plaintiff accepts

---

515 (1970). The action survives to certain named relatives, Tenn.Code Ann. 20-5-106 (1980). There is no independent action for loss of society or companionship nor may such an element of damage be considered under Tennessee law. *See Davidson Benedict Co. v. Severson,* 109 Tenn. 572, 72 S.W. 967, 982 (1903). Federal law is not deficient, because in *Smith* the Supreme Court instructed other courts to consider common law in determining damages under section 1983. Even if federal law was deficient, however, Tennessee law would be inapplicable because it is inconsistent with the fundamental intent of section 1983 to provide redress for Constitutional deprivations under color of state law. The tort law of Tennessee and the federal purpose of vindicating civil rights address wholly different concerns. *See Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Some courts have held that a wrongful death act which protects only property interests of survivors, as does the Tennessee act, is neither appropriate nor analogous enough to provide the rule of decision when a nonproperty right is infringed. *See Espinoza v. O'Dell,* 633 P.2d 455, 465 (Colo.1981), *cert. dismissed,* 456 U.S. 430, 102 S.Ct. 1865, 72 L.Ed.2d 237 (1982); *Bell v. City of Milwaukee,* 746 F.2d 1205 (7th Cir.1984).

**2.** It is a matter of concern to the court whether the rule established by this case should extend to more attenuated relationships. These matters, not being before the Court, are left to another day. *See,* however, in this regard, Note, *Section 1983 Actions by Family Members Based on Deprivations of the Constitutional Right to "Family Association" Resulting from Wrongful Death: Who has Standing?,* 14 Fordham Urb. L.J. 441 (1985).

a remittitur of $75,000 on pain and suffering (total award of $25,000) and a remittitur of $100,000 for the pecuniary life of the deceased (total award of $150,000). All other grounds on the motion for a new trial are denied.

The motion for judgment notwithstanding the verdict as to that portion of the jury's verdict which awarded Maria Sharpe $150,000 for the permanent loss of the society and companionship of her son, Joel Sharpe, is granted as to individual defendants Campbell, Duckworth, Blankenship, Jack Green, Bless and Ray Green. The motion on behalf of the City and County is denied.

A hearing on attorneys' fees will be held on February 9, 1988, at 1:00 p.m.