## IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON

BRITTNEY PATTERSON, a minor,    )
by and through her next friend and    )
natural guardian, STEVEN EDWARD    )
PATTERSON, next of kin and child of    )
TAMMI McDANIEL PATTERSON,    )
    )
    Plaintiff/Appellees,    )    Madison Circuit No. C-94-202
    )
v.    )
    )    Appeal No. 02A01-9710-CV-00256
JERRY LESLIE DUNN, COWLEY,    )
INC., JERRY C. HARDIN, FRED    )
TEAGUE, DAVID TEAGUE,    )
HAYWOOD COUNTY and BILLY T.    )
WILLIAMS,    )
    )
    Defendants/Appellants.    )

FILED

June 16, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

APPEAL FROM THE CIRCUIT COURT OF MADISON COUNTY
AT JACKSON, TENNESSEE


THE HONORABLE FRANKLIN MURCHISON, JUDGE

For the Plaintiff/Appellee:    For the Defendants/Appellants,
    Jerry C. Hardin, Fred Teague and David Teague:

Jerry O. Potter    Richard Glassman
John R. Cannon, Jr.    James F. Horner
Chapman Sellers Morrow    Memphis, Tennessee
Memphis, Tennessee

**AFFIRMED**


HOLLY KIRBY LILLARD, J.


CONCUR:

W. FRANK CRAWFORD, P.J., W.S.

ALAN E. HIGHERS, J.

**OPINION**

This is an action for the wrongful death of the plaintiff's mother, whose death was the result of two separate vehicular accidents. A jury allocated fault among the deceased and the three other parties involved in the two accidents. The jury awarded total damages of $625,045 and assessed 75% of the fault against the appellants, the driver and owners of the truck involved in the first of the two accidents. These defendants appeal to this Court. We affirm.

Two separate accidents on the morning of May 26, 1994 resulted in the death of Tammi McDaniel Patterson ("Patterson"), a single mother with one child. At approximately 7:30 a.m., Tammi Patterson was traveling eastbound on Interstate 40 ("I-40"). It was raining heavily and visibility was low. Also traveling eastbound on I-40, behind Patterson, was a dump truck owned by Haywood County, driven by Billy T. Williams ("Williams"). Another truck, a sand truck filled with a load of sand, was owned by Defendants Fred Teague and David Teague ("the Teagues") and driven by employee Jerry C. Hardin ("Hardin"), acting within the scope of his employment for the Teagues. The sand truck was entering I-40 eastbound and struck Patterson's vehicle from the rear in a relatively minor accident. When Patterson and Hardin pulled off the road, Hardin's sand truck remained partly in the lane of traffic. Within moments, a tractor trailer hauling mail, owned by Cowley, Inc. ("Cowley") and driven by employee Jerry Leslie Dunn ("Dunn") came eastbound on I-40. Dunn was acting within the scope of his employment at the time. Dunn's mail truck rear ended Hardin's sand truck, causing the sand truck to flip over and land on Tammi Patterson's vehicle, burying her vehicle in sand and asphyxiating her.

Plaintiff/Appellee, Brittney Patterson ("Plaintiff"), Tammi Patterson's minor child, filed suit for wrongful death on July 15, 1994 by and through her next friend and natural guardian, her father Steven Edward Patterson. The lawsuit was filed against the Teagues and Hardin (referred to collectively as "the Teague Defendants"), Dunn and Cowley, and Haywood County and Williams. The complaint alleged that the Defendants' negligence in the operation of their vehicles directly resulted in Tammi Patterson's death, and sought both compensatory and punitive damages. The request for punitive damages was dropped at trial. Defendants Dunn and Cowley filed a cross-complaint against the Teague Defendants. Defendants Fred and David Teague filed a cross-complaint against Defendants Haywood County, Williams, Dunn, and Cowley. The trial court later

dismissed the Teagues' cross-claim against Haywood County and Williams.[1] Subsequently, the trial court approved a settlement of Plaintiff's claims against Defendants Dunn and Cowley for $525,000.

At trial, Williams testified about how the accident occurred. Williams described the weather at the time of the accident as "extremely bad" and said that it was raining "very hard." Williams stated that he noticed Tammi Patterson's car traveling in the right-hand lane ahead of his dump truck and Hardin's sand truck. Hardin's sand truck was approximately halfway down the entrance ramp to the highway, and was in the process of merging onto the highway. Williams stated that he was also traveling in the right-hand lane, but slowed to allow the sand truck to enter the highway. Williams was traveling approximately fifty to sixty miles per hour and estimated that Hardin was traveling at least as fast as Williams was. Hardin's sand truck did not travel all the way down the acceleration lane, but merged onto the highway approximately ten to twelve feet short of the end of the ramp. Within seconds of Hardin's sand truck entering the highway, Williams noticed the sand truck making a swerving motion and then car headlights shining into the woods. Williams quickly accelerated into the left lane, around Hardin's truck. Williams then moved back into the right lane, pulling off the side of the road and stopping. Before the sand truck pulled onto the highway, Williams testified that Tammi Patterson's car was traveling straight ahead and was not out of control.

Both Tammi Patterson and Hardin pulled over to the shoulder of the road. Hardin's sand truck remained slightly in the right-hand lane of traffic. Before any of the parties had exited their vehicles, the tractor trailer driven by Dunn and owned by Cowley rear ended Hardin's sand truck, pushing the sand truck forward and upside down on top of Tammi Patterson's car. As Williams was moving into the left lane to avoid Hardin's sand truck, he felt an impact to his own truck. Williams later learned that the impact he felt to his truck when passing the accident was the engine from Dunn's mail truck hitting his vehicle. Williams stated that he approached both Dunn's and Hardin's trucks to see whether the drivers were hurt. He then approached Tammi Patterson's car, which was buried in sand from the dump truck. All he could see of Tammi Patterson was her right arm protruding from the sand. Williams said that he "took her hand and talked with her till she gave up." He remembered her squeezing his hand several times until her grip finally faded. Williams said that

_____

[1]    The record does not reflect the disposition of the Teagues' cross-claim against Dunn and Cowley.

2

Tammi Patterson never spoke and that he could not determine whether she was conscious.

In his testimony, Hardin presented a conflicting version of the events of May 26. He testified that he is paid on commission per load of gravel or sand he hauls. On the day of the accident, Hardin testified that his truck was loaded with approximately fifty thousand pounds of sand. Hardin said that it was raining on the morning of the accident, "[s]omewhere between medium and hard." When he started down the entrance ramp to the highway, he stated that he looked to see the traffic on the highway and could "see lights and stuff," but "couldn't make out what nothing was." He testified that he followed the merge lane all the way down to the end before entering the highway. At the time that he merged onto the highway, Hardin looked in his side mirror to ascertain the surrounding traffic and did not see any traffic close to his truck. When he straightened out on the highway and looked in his side mirror, he noticed Tammi Patterson's red car behind his vehicle in the left lane, which he noticed was traveling faster than his truck. He was next aware of the red car "spinning out of control in the road." Hardin stated that he pulled to the shoulder of the road to avoid a collision with the car. While he was pulling to the right, the red car swung across in front of him and he felt an impact to his truck. In describing the path of Tammi Patterson's vehicle in front of him, Hardin said that "the car suddenly shot right across in front of me sideways." He was unsure whether the car hit his truck or whether his truck hit the car, but stated that Tammi Patterson's car hit the guardrail in addition to his truck. Hardin stated that he had been traveling at approximately forty to forty-five miles per hour and accelerating when he entered the highway, and could not have been traveling much faster when the initial impact with Tammi Patterson's car occurred. Hardin stated that he slowly eased off the highway to prevent pinning the car in between his truck and the guardrail because he could not see Tammi Patterson's car over the hood of his truck. Hardin acknowledged that there was ample room to pull completely off the road.

Within a couple of seconds, Hardin's sand truck was struck from behind and he was "going up the road." When he was hit from behind, Hardin estimated that about half or slightly less than half of his truck was still in the right-hand lane of the highway.

David Glenn Teague, one of the owners of the sand truck Hardin was driving, testified that he arrived at the scene after the accident. David Teague testified that Williams told him that he saw Tammi Patterson's car lose control and disappear in front of the sand truck. According to Teague's testimony, Dunn told Teague that he was traveling in the right-hand lane of traffic behind Williams'

3

truck, when Williams swerved into the left lane of traffic. Dunn tried to avoid hitting the Hardin truck located in the right-hand lane, but was unable to.

Dunn testified that he worked for Cowley, Inc., which contracts with the United States Postal Service to transport mail. He was driving a tractor-trailer truck loaded with mail. On the morning of the accident, Dunn considered the rain to be "a little more than a moderate rain." He was also traveling eastbound on Interstate 40 that morning. He said that Williams' dump truck was about two truck lengths in front of him, in the left lane of traffic. At the point where he could completely see the entrance ramp, Dunn moved from the left to the right lane of traffic. Dunn testified that Williams switched to the right lane of traffic at about the same time, and the distance between the two trucks decreased to about one truck length. Dunn stated that, at the time he switched lanes, there were no cars on the entrance ramp. Hardin's sand truck was ahead of Williams' dump truck and it looked to Dunn like the sand truck had cleared the merge lane. Williams' dump truck then merged back into the left-hand lane of traffic. Dunn's mail truck was then "right on top" of Hardin's sand truck and could not stop in time. Dunn did not see Tammi Patterson's car spinning around three hundred and sixty degrees in the left-hand lane of traffic, nor did he see any brake lights or hazard lights on Hardin's sand truck. Dunn stated that if Hardin's sand truck had pulled off the road entirely, without any part of Hardin's vehicle remaining on the roadway, then Dunn would not have hit the sand truck.

John Briley ("Briley"), The Tennessee Department of Safety trooper who was dispatched to the scene of the accident, testified that he was alerted to the wreck at approximately 7:30 a.m. He said that it was raining heavily. He observed that the right rear tail light of Tammi Patterson's car was damaged. He also found a scuff mark and a piece of red tail light lens on the guardrail. Briley did not find any debris from the rear of Tammi Patterson's car in the roadway, but noted that there were scuff marks on the driver's side door. Officer Briley also found a piece of the hub that covered the lug nuts from Hardin's sand truck in the roadway. This piece was located several feet behind the final resting places of the vehicles, close to where the road turned from asphalt to concrete. Based on scuff marks in the road, it was Briley's opinion that the sand truck and Tammi Patterson's car had both come to a complete stop when the sand truck was hit by Dunn's mail truck. Officer Briley testified that nothing prevented Hardin from moving his sand truck entirely off the road into the emergency lane.

Bobby Lee Hall, an accident investigator, testified as an expert for the Teague Defendants.

4

Hall testified that he had a conversation with Williams at approximately 9:30 p.m. on June 2, 1994, when he called Williams at home. The telephone conversation was audio recorded with Williams' permission and a transcription of the tape was entered into evidence at trial. Hall testified to the accuracy of the transcription, but noted that it contained several blanks because portions of the tape were inaudible. On cross examination by Plaintiff's counsel, Hall admitted that he had talked with Hardin sometime before calling Williams. In his cross examination of Hall, Plaintiff's counsel emphasized one of Hall's questions in which he referred to Hardin; Hall asked Williams: "He thought he was about in 9th gear and gotten up probably to 50 somewhere around 50 miles an hour?"

A second expert, David G. Brown, testified for the Teague Defendants. Brown has a master's degree in mechanical engineering and has performed consulting work involving traffic accident investigation for more than twenty years. Brown gave his expert opinion at trial about how the two accidents occurred. Brown reviewed the police report, including handwritten statements, pictures of the accident scene, pictures of the vehicles and accident site taken at a later time, and the depositions of the drivers involved in the accident. In addition, he inspected the accident scene and met with Trooper Briley, the police officer dispatched to the scene. When Brown inspected the site at which the accident occurred, Brown noted the condition of the roadway and took a variety of measurements. He testified about an area of transition of the roadway from asphalt to concrete where, in his opinion, the condition of the concrete was poor. When he examined photographs of Tammi Patterson's car, he noted that the only damage was to the right rear lens grouping, which resulted from impact with the guardrail. He found no evidence that Tammi Patterson's car was rear ended or "overrun" by the Hardin sand truck. Brown relied on several items of physical evidence in forming his opinion: the damage to the right rear of the car, the lack of additional damage to the rear of the car, the guardrail damage, the damage to the driver's side door of the car, the paint marks on the bumper of Hardin's sand truck, and the transition area of the pavement. Brown opined that Tammi Patterson lost control of her car when it encountered the transition area on the roadway, at which point the vehicle started spinning to the right, crossed in front of the sand truck, ricocheted off the guardrail back into the roadway, and impacted with Hardin's truck on the driver's side of the car. Brown testified that, in reaching his conclusion, he relied on Hardin's testimony that the car was spinning and traveling from left to right. Brown did not feel that this was inconsistent with Williams' testimony that the car was originally in the right lane of traffic. He testified that there was

5

not enough information available to calculate the speeds of the vehicles. He also testified that the shoulder was wide enough for Hardin to pull his truck completely off the road and that, if Hardin had pulled completely off the road, this accident would never have happened, although some other accident may have occurred.

The jury also heard testimony from the physician who performed the autopsy on Tammi Patterson, O'Brian Clary Smith, M.D. Dr. Smith testified that the cause of death was traumatic asphyxia, which means that "she died as a result of compressive forces or squeezing forces on her chest to the point where she was unable to breathe, and that inability to breathe led to her death." He stated that her body had pressure marks around her face, jaw, neck, and chest along with bruises and skin scrapes to her back, "indicating compressive forces or squeezing forces . . . applied to the back and to the front." He was of the opinion that Patterson was not killed instantly because an asphyxial death is not instantaneous. Dr. Smith noted that Patterson had a fractured rib, which caused bleeding and some inhalation of blood. He testified that Patterson's cuts and scrapes bled into the surrounding tissue, indicating that she had blood pressure for a period of time and did not die instantaneously. Moreover, Dr. Smith stated that, if Patterson squeezed Williams' hand, it would be an "indication of a volitional, voluntary-type action, which would require a degree of consciousness." He explained that when a person is denied oxygen, the person may experience "air hunger" and become anxious or desperate over the lack of oxygen and thrash around or become combative and eventually become unconscious. Dr. Smith testified that Tammi Patterson's first lumbar vertebra was fractured with the spinal cord cut at that point, and that this injury would have paralyzed both her legs.

Extensive evidence was presented at trial about Tammi Patterson's earning capacity and financial affairs. Patterson's mother, Patricia Ann McDaniel ("McDaniel"), testified that Patterson attended approximately a year and one-half of college at Jackson State. After Patterson's divorce from Steve Patterson in 1991, she and her daughter Brittney moved in with her parents for a time. McDaniel stated that although her daughter was employed full time, she had difficulty meeting her expenses because of her low wages. The McDaniels helped their daughter financially, including car maintenance, paying her utilities when they were about to be cut off, paying half of Brittney's private school tuition, and buying her a house. McDaniel stated that her daughter attempted to pay the monthly mortgage payment in the form of rent to the McDaniels, but did not make the payments

6

every month. The McDaniels paid for their daughter's funeral expenses because her estate lacked the assets from which the bill could be paid.

Thomas O. Depperschmidt ("Depperschmidt"), a professor of economics at the University of Memphis, testified on behalf of the Plaintiff on his expert opinion as to Tammi Patterson's lost earning capacity. In his calculations, Depperschmidt used her earnings of six dollars an hour, or $12,480 per year, from her job at the law firm where she worked and her fringe benefits, and included her employer's contribution to FICA at 7.65% of her salary and contribution of two hundred twenty dollars a month for medical insurance. Therefore, Depperschmidt based his opinion on a total yearly income of $16,075. He also reviewed her employment at The Eye Clinic where she worked from 1991 to 1993. For 1992, her earnings were $12,196.80. Depperschmidt subtracted out a personal maintenance deduction, or "the amount of expenditure that she would have made on herself" for necessary items, to come up with a net income figure to determine lost earning capacity. To determine the personal maintenance deduction, Depperschmidt used a Department of Labor publication to ascertain the average expenditures for a two-person household on food, clothing, shelter, transportation, and medical care. This publication gave the figure of 25.18% for a two-person household earning $40,384 per year. Depperschmidt stated that he used this figure because he was not aware of any charts for a two-person household earning less than $40,384 per year. Using the 25.18% personal maintenance deduction figure, Depperschmidt calculated Patterson's lost wages from May 26, 1994, the date of the accident, to February 24, 1997, the date of the trial, at $33,087.

To calculate future earnings, Depperschmidt multiplied the base salary of $16,075 by 36.5 years, or the work years to age seventy from the trial date, deducted the personal maintenance deduction, and discounted the figures to present value. Depperschmidt used the 25.18% personal maintenance deduction for 5.87 years until Brittney would reach eighteen years old. For the remaining years, Depperschmidt used a personal maintenance figure of 50.55% for a one-person household. Based on these figures, the future earnings until Brittney turned eighteen were $65,993, and future earnings after Brittney turned eighteen were $160,088, with total net future earnings of $226,081. On cross examination, Depperschmidt admitted that he did not consider any of Tammi Patterson's specific budgetary items in his calculations of the personal maintenance deduction, but used only the tables from the Department of Labor, which contained averages for two-person

7

households.

The Teague Defendants made several objections to Depperschmidt's testimony. The first objection related to Depperschmidt's qualifications as an expert witness. The Teague Defendants declined the trial court's offer to voir dire the witness at that time, however, and chose instead to reserve the issue for cross examination. The Teague Defendants also asserted that there was no foundation for the income figures on which Depperschmidt was to testify. This objection was overruled by the trial court because of the Plaintiff's assurance that evidence of the deceased's income would be introduced subsequent to the expert's testimony.

Kenneth Lynn Walker, an attorney at the law firm where Patterson worked at the time of her death, testified that she was a good worker with good potential and appeared to have a lot going for her. He acknowledged that the firm provided hospitalization insurance for Patterson. The law firm provided an Internal Revenue Service form showing Patterson's income. Her prior employer at The Eye Clinic testified that she was friendly and productive. The Eye Clinic also provided W-2 forms showing Patterson's income during her employment.

During the trial, the Plaintiff took a voluntary nonsuit as to Defendants Williams and Haywood County. Plaintiff's counsel took a nonsuit as to Williams and Haywood County immediately after Williams' testimony, in the presence of the jury. The Defendants requested a mistrial based on the Plaintiff's counsel taking a mistrial in the jurors' presence. The trial court denied the mistrial, and entered an order of voluntary nonsuit.

At the conclusion of the evidence, the jury returned a total verdict of $625,045.20 in favor of the Plaintiff. The jury allocated 0% of the fault to Tammi Patterson; 75% of the fault to the Teagues and Hardin; 25% of the fault to Cowley and Dunn; and 0% of the fault to Haywood County and Williams. Therefore, the trial court entered an order for judgment against Defendants Hardin and Fred and David Teague in the amount of $468,783.90. Hardin and the Teagues' motion for a new trial was denied. Hardin and the Teagues now appeal to this Court.

On appeal, the Teague Defendants assert that: (1) The trial court erred in denying the motion for a new trial based on the misconduct by the Plaintiff's counsel in taking a voluntary nonsuit in the presence of the jury immediately after calling Williams as an adverse witness; (2) The trial court erred in failing to instruct the jury that the Plaintiff had previously filed suit against Dunn and Cowley and failing to allow the Defendants to introduce into evidence pleadings that the Plaintiff

8

filed against Dunn and Cowley; (3) The trial court erroneously allowed the deceased's funeral bill to be admitted into evidence even though the Plaintiff did not pay the bill; (4) The Plaintiff's expert was erroneously allowed to testify despite the fact that he relied on tables not reasonably relied on by experts in his field;  (5) The amount of the verdict was contrary to the evidence; (6)  The trial court erred in denying the Teague Defendants' motions for directed verdict and for a new trial; (7) The trial court abused its discretion in failing to use the Teague Defendants' jury verdict form; and (8) The trial court erred in allowing the jury to consider the fault of Williams and Haywood County because their liability is governed by the Tennessee Governmental Tort Liability Act and, under the Act, the trial court was required to determine their fault.

Where, as here, a trial judge has approved a jury's verdict, the findings of fact by the jury are upheld if there is any material evidence to support the verdict.  *See* Tenn. R. App. P. 13(d).  Thus, absent a reversible error of law, a judgment on a jury verdict is set aside on appeal only if the record contains no material evidence to support the verdict. ***See Foster v. Bue***, 749 S.W.2d 736, 741 (Tenn. 1988).

The Teague Defendants argue first that the conduct of the Plaintiff's counsel in voluntarily nonsuiting Williams and Haywood County in the presence of the jury immediately after calling Williams as an adverse witness justified a new trial.  The Teague Defendants concede that Rule 41 of the Tennessee Rules of Civil Procedure allows a party to take a voluntary nonsuit in open court. They argue, however, that the Plaintiff did not have the right to take a nonsuit in the presence of the jury because this action signaled to the jury that the Plaintiff believed Williams was not at fault.  The Plaintiff responds that Rule 41 of the Tennessee Rules of Civil Procedure allows a voluntary nonsuit at any time before the jury retires and that the voluntary nonsuit was taken the morning after Williams finished testifying, not simply "subsequent to taking a break with the jury out" as the Teague Defendants suggest.  The Plaintiff notes that the trial court would have had to inform the jury that Williams and Haywood County were no longer parties regardless of when the Plaintiff took the nonsuit, and that therefore no prejudice resulted from the nonsuit.  In this case, the trial court made an affirmative finding that there was no prejudice from the voluntary nonsuit in the jury's presence.

"A motion for a new trial based on counsel . . . misconduct is directed to the discretion of the trial court and its decision will not be reversed except for abuse of discretion." ***Budoff v. Holiday Inns, Inc.***, 732 F.2d 1523, 1525 (6th Cir. 1984).  Rule 41 of the Tennessee Rules of Civil Procedure

provides that a party can take a nonsuit by "an oral notice of dismissal made in open court during the trial of a cause; or in jury trials at any time before the jury retires to consider its verdict." Tenn. R. Civ. P. 41.01(1). The rule does not restrict voluntary nonsuits in the presence of the jury. Moreover, the trial court in this case found that the nonsuit caused no prejudice against the Teague Defendants. We find no abuse of discretion in the trial court's denial of the Teague Defendants' motion for a new trial based on the Plaintiff's voluntary nonsuit in the presence of the jury. The trial court's denial of the Teague Defendants' motion for new trial on this basis is affirmed.

The Teague Defendants next argue that the trial court erred in failing to instruct the jury that the Plaintiff had previously filed suit against Dunn and Cowley and in excluding from evidence the Plaintiff's complaint against Dunn and Cowley. The first request found in the record to introduce into evidence the Plaintiff's pleadings filed against Dunn and Cowley is in the Teague Defendants' motion for a new trial. In the hearing on the motion for new trial, the Teague Defendants argued that the jury is entitled to know a plaintiff's allegations against a defendant that is no longer a party to the suit. The Plaintiff cites *Pankow v. Mitchell*, 737 S.W.2d 293, 296 (Tenn. App. 1987), for the proposition that pleadings are only admissible if they are allegations of fact. The Plaintiff asserts that the complaint against Dunn and Cowley contained only conclusory allegations. The trial court denied the motion for new trial, finding that the pleadings were not substantive evidence and therefore had no evidentiary value. The trial court also concluded that the pleadings could not be used for impeachment of a party in this case because the Plaintiff did not testify about how the accident happened.

10

In Tennessee, "factual statements contained in pleadings filed on behalf of a party may be considered as admissions." *Pankow v. Mitchell*, 737 S.W.2d 293, 296 (Tenn. App. 1987); *see also First Tenn. Bank v. Mungan*, 779 S.W.2d 798, 801 (Tenn. App. 1989). Such admissions are admissible against the party, making them "both as substantive evidence and for the purpose of impeachment." *Pankow*, 737 S.W.2d at 296.

In *Branch v. McCroskey*, No. 03A01-9709-CV-00385, 1998 WL 47873, at *4 (Tenn. App. Feb. 5, 1998), the plaintiff sought to introduce into evidence allegations the defendant made in a cross claim against the cross defendant. The substance of these allegations was "[t]hat while in the sole possession, custody and control of the [cross defendant], one (1) of the [defendant's] two (2) horses suffered serious injuries which were proximately caused by the negligence of the [cross defendants]." *Id.* This Court held that the allegations in the cross claim were conclusory and not admissions of fact, and that therefore the trial court did not err in not allowing the plaintiff to cross examine the defendant about the allegations. *See id.*

Other jurisdictions are divided on the admissibility of pleadings which contain claims of comparative negligence against defendants who have been dismissed or who have settled. *Lytle v. Stearns*, 830 P.2d 1197, 1206 (Kan. 1992). *See Haynes v. Manning*, 717 F. Supp. 730, 733 (D. Kan. 1989), *aff'd in part and rev'd in part on other grounds*, 917 F.2d 450 (10th Cir. 1990), (allowing use of plaintiff's prior pleadings against dismissed defendants based on the abandoned pleadings doctrine, which allows abandoned pleadings to be admitted as admissions by plaintiffs); *Dreier v. Upjohn Co.*, 492 A.2d 164, 166-69 (Conn. 1985) (allowing introduction of original complaint, which was later amended, as an evidentiary admission, finding that pleading rules do not exempt parties from the requirement that they must have a reasonable belief in the truth of the matters asserted in a complaint). *Cf. Mason v. Texaco, Inc.*, 129 F.R.D. 542, 543-47 (D. Kan. 1989), *aff'd in part and remanded on other grounds*, 948 F.2d 1546 (10th Cir. 1991), (allowing the use of an inconsistent pleading from a prior suit to show plaintiff's belief that other parties were negligent, although expressing "considerable reservations as to the probative value of the conclusory allegations" based on court's finding that "minimal probative value" does not in itself bar admission under exceptions to the hearsay rule).

11

Other jurisdictions do not allow the use of such pleadings, reasoning that admissibility is incompatible with the liberal pleading and joinder rules in the rules of evidence, allowing alternative or even inconsistent allegations and pleadings. *See Whatley v. Armstrong World Indus., Inc.*, 861 F.2d 837, 839 (5th Cir. 1988); *Garman v. Griffen*, 666 F.2d 1156, 1159-60 (8th Cir. 1981); *Bargman v. Economics Lab., Inc.*, 537 N.E.2d 938, 944-45 (Ill. App. 1989); *Lytle v. Stearns*, 830 P.2d 1197, 1205-09 (Kan. 1992); *Larion v. City of Detroit*, 386 N.W.2d 199, 200-02 (Mich. App. 1986); *Haderlie v. Sondgeroth*, 866 P.2d 703, 713-14 (Wyo. 1993).

The modern trend, appears to be to disallow the use of such pleadings as admissions:

> "The modern equivalent of the common law system is the use of alternative and hypothetical forms of statement of claims and defenses, regardless of consistency. It can readily be appreciated that pleadings of this nature are directed primarily to giving notice and lack the essential character of an admission. To allow them to operate as admissions would render their use ineffective and frustrate their underlying purpose. Hence the decisions with seeming unanimity deny them status as judicial admissions, and generally disallow them as evidential admissions."

*Lytle*, 830 P.2d at 1207 (quoting McCormick on Evidence § 265, 781-82).

The Teague Defendants apparently sought to introduce into evidence the Plaintiff's allegations that Dunn and Cowley:

> A. Failed to maintain a proper lookout;
> B. Failed to be attentive in the operation of their vehicle;
> C. Failed to exercise that degree of care and caution that a reasonable person would exercise under the circumstances thereunto pertaining;
> D. Failed to yield the right-of-way;
> E. Failed to operate the vehicle at a safe and reasonable speed under the weather and road conditions thereunto existing;
> F. Failed to properly maneuver their vehicle in order to avoid a collision with the Plaintiff's decedent; and
> G. Failed to maintain a proper distance between their vehicle and the vehicle traveling in front of them.

The Teague Defendants also sought to introduce into evidence allegations in the Plaintiff's complaint against Dunn and Cowley that several statutes were violated pertaining to speed limits, reckless driving, and following too closely. Thus, the Teague Defendants sought to have the Plaintiff's allegations of the legal liability of Dunn and Cowley admitted into evidence at trial.

We find persuasive the reasoning in the cases in which the court disallowed the use of such pleadings as judicial and evidentiary admissions, under the circumstances presented in this case. The Plaintiff's pleadings are not inconsistent with the Plaintiff's contentions at trial. The Plaintiff did not assert at trial that the Teague Defendants were solely responsible for the accident which resulted in Tammi Patterson's death. Moreover, the Plaintiff did not testify about how the accident occurred.

12

Therefore, the pleadings would not be admissible for impeachment purposes. In addition, the pleadings against Dunn and Cowley contain only conclusory allegations, not admissible under *Branch*. *See Branch v. McCroskey*, No. 03A01-9709-CV-00385, 1998 WL 47873, at *4 (Tenn. App. Feb. 5, 1998).

Even if the trial court's refusal to allow the introduction of the pleadings into evidence was deemed error, it would be harmless because the substance of the pleadings reached the jury through the Teague Defendants' cross examination of Dunn at trial and the testimony of their expert witness. *See Tuggle v. Raymond Corp.*, 868 S.W.2d 621, 626 (Tenn. App. 1992) (citing *Pankow v. Mitchell*, 737 S.W.2d 293, 298 (Tenn. App. 1987)). The jury had sufficient evidence from which to determine Dunn and Cowley's relative fault in the death of Tammi Patterson. The trial court's refusal to allow the Teague Defendants to introduce these pleadings into evidence is not reversible error.

The Teague Defendants also assert that the trial court erred in allowing the Plaintiff to introduce into evidence the decedent's funeral bill because the Plaintiff did not pay the expenses. The funeral expenses were paid by Patterson's parents because her estate did not have sufficient funds. The Teague Defendants assert, that in a wrongful death action, the statute limits recovery to "damages resulting to the parties for whose use and benefit the right of action accrues." Tenn. Code Ann. § 20-5-113 (1994). In this case, they argue, a non-party paid the expenses, not the Plaintiff.

The Tennessee Wrongful Death Statute does not directly address the payment of funeral expenses. *See* Tenn. Code Ann. § 20-5-113 (1994). However, it has long been the law in Tennessee that funeral expenses are recoverable. *See Landrum v. Callaway*, 12 Tenn. App. 150, 159 (1930). In *Jordan v. Baptist Three Rivers Hospital*, 984 S.W.2d 593 (Tenn. 1999), the Court observed that Tennessee's Wrongful Death Statute permits survivors to "recover damages for their losses suffered as a result of the death." *Id.* at 598 (citing Tenn. Code Ann. § 20-5-113 (1994)). The *Jordan* Court noted specifically that funeral expenses are among the items recoverable. *See id.* at 600.

The Teague Defendants cite *Downs v. United States of America*, 382 F. Supp. 713, 739, 741-742 (M.D. Tenn. 1974), *rev'd on other grounds*, 522 F.2d 990 (6th Cir. 1975), for the proposition that a person to whom a claim survives is entitled to reimbursement for funeral expenses only if that person paid for the funeral expenses. The reasoning in *Downs*, however, was based on the Florida Wrongful Death Statute, which states expressly that funeral expenses may be recovered "by a survivor who has paid them." Fla. Stat. Ann. § 768.21(5). Alternatively, the Florida statute specifies

that a personal representative may recover for funeral expenses "that have become a charge against her or his estate or that were paid by or on behalf of decedent." Fla. Stat. Ann. § 768.2(6)(b). The Tennessee Wrongful Death Statute contains no such express limitation and therefore *Downs* is inapplicable.

Where the funeral expenses are clearly a recoverable item, the defendants will not be permitted a windfall because the decedent's estate had insufficient funds to pay the funeral expenses and the decedent's parents were forced to do so in order to bury their daughter. *See Fye v. Kennedy*, No. 03A01-9707-CV-00287, 1998 WL 338198, at *8 (Tenn. App. June 26, 1998) (discussing the collateral source rule in connection with the Tennessee Wrongful Death Statute). The trial court is affirmed on this issue.

The Teague Defendants next argue that the trial court erred in allowing Depperschmidt to testify on behalf of the Plaintiff regarding Tammi Patterson's lost earning capacity. The Teague Defendants contend that, contrary to the requirements of Rule 703 of the Tennessee Rules of Evidence, Depperschmidt did not testify that the governmental tables used in his calculation of lost earning capacity are relied on by other experts in the field.[2] The Teague Defendants assert that the tables used to determine the personal maintenance deduction disregarded the decedent's actual income of $12,480 per year because they were based on a household with pre-tax income of $40,384 per year. They also assert that Patterson used all of her income on her personal maintenance, not twenty-five percent as calculated by Depperschmidt using the government tables. The Plaintiff argues that the Teague Defendants never objected at trial to the use of the tables to calculate the personal maintenance deduction, and that consequently the issue is waived on appeal. At the hearing on the motion for a new trial, the trial court found that there was nothing improper about Depperschmidt's testimony.

---

[2] Rule 703 of the Tennessee Rules of Evidence concerning bases of opinion testimony by experts reads:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Tenn. R. Evid. 703.

The trial court is afforded wide discretion in the admission or rejection of evidence, and the trial court's action will be reversed on appeal only when there is a showing of an abuse of discretion. *See Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 442 (Tenn. 1992); *Davis v. Hall*, 920 S.W.2d 213, 217 (Tenn. App. 1995).

The Tennessee Rules of Evidence require that objections be specific and timely. *See* Tenn. R. Evid. 103(a)(1).

> It is the duty of a party objecting to evidence to communicate, at the time, to the court and the opposite party, the grounds of his objection, and the trial court may, and should, require him to assign the ground, and his failure so to do would deprive him of the right to rely upon the objection. The reason for this rule is that the opposite party may be given the opportunity to act advisedly, and not be entrapped into error after it is too late to remedy the matter by introducing new evidence, which might be done if specific objection was made.

Tenn. Jur., Appeal and Error § 41 (1995). Where a party fails to timely object to evidence, the objection is then waived. *See Yellow Bus Line, Inc. v. Brenner*, 213 S.W.2d 626, 632 (Tenn. App. 1948). This rule gives the trial court an opportunity to rule on the objection and enables opposing counsel to cure the objection. *See State v. Mounce*, 859 S.W.2d 319, 323 (Tenn. 1993).

During Depperschmidt's testimony, the Teague Defendants objected to Depperschmidt's qualifications as an expert witness and to the lack of foundation for the evidence on which the expert was basing his opinion. However, there was no objection to the use of the government tables during Depperschmidt's testimony when the Plaintiff would have had the opportunity to cure the alleged error. Indeed, the Teague Defendants cross examined Depperschmidt at length about the applicability of the tables to the facts of this case. Evidence was presented on Tammi Patterson's finances from which the jury could have determined whether the 25% personal maintenance deduction used by Depperschmidt was appropriate. After Depperschmidt's testimony, the Teague Defendants did not ask that his testimony based on the tables be stricken from the record. "A party may not save an infirmity in the proceedings as an 'ace in the hole' to be used in case of an adverse decision or suppressed in event of a favorable decision." *Cupples v. Cupples*, No. 02A01-9408-CH-00193, 1995 WL 650134, at *5 (Tenn. App. Nov. 2, 1995) (citing *Harwell v. Walton*, 820 S.W.2d 116, 120 (Tenn. App. 1991)). After a review of the record, we find that this issue was not preserved for appeal and find no abuse of discretion by the trial court in admitting into evidence Depperschmidt's testimony.

The Teague Defendants contend that the amount of the verdict in this case is contrary to the

weight of the evidence, considering the decedent's alleged pain and suffering and the pecuniary value of the decedent's life. They argue that there was no direct evidence of conscious pain and suffering in the record, and that even assuming that there was such direct evidence, the testimony of the physician who performed the autopsy was that death occurred within four minutes and that unconsciousness occurred prior to that. The Teague Defendants cite *Sharpe v. City of Lewisburg*, 677 F. Supp. 1362 (M.D. Tenn. 1988), in which a district court reduced a $100,000 jury award for pain and suffering to $25,000 where the decedent lived no more than a few minutes. *See id.* at 1365. The Teague Defendants also contend that the evidence of the pecuniary value of Tammi Patterson's life did not support such a high award, and emphasize her precarious financial situation and lost earning capacity of only $226,081.

The Plaintiff argues that *Sharpe* is distinguishable for several reasons. In *Sharpe*, the trial court determined that the verdict was excessive, while in this case, the trial court approved the verdict. The Plaintiff asserts that *Sharpe* does not discuss the proof presented at trial on pain and suffering, thus preventing a comparison with this case of the manner and timing of death. Finally, the Plaintiff recites Tennessee law that "[e]ach case must depend upon its own facts." *Southern Ry. Co. v. Sloan*, 407 S.W.2d 205, 211 (Tenn. App. 1965). The trial court found that there was ample evidence of the Teague Defendants' fault in the accident and that the jury allocation of fault was reasonable. The trial court also stated, "the Court looks at the 625 and that's all, because that's what they jury put as the total amount of damages. And that's reasonable."

Where, as here, a trial judge has approved a jury's verdict, our standard of review is whether there is any material evidence to support the verdict. *See* Tenn. R. App. P. 13(d). Thus, absent a reversible error of law, we will set aside a judgment on a jury verdict only where the record contains no material evidence to support the verdict. *See Foster v. Bue*, 749 S.W.2d 736, 741 (Tenn. 1988). " 'The amount of the verdict is primarily for the jury to determine, and next to the jury the most competent person to pass upon the matter is the judge who presided at the trial and heard the evidence.' " *Thrailkill v. Patterson*, 879 S.W.2d 836, 841 (Tenn. 1994) (quoting *Reeves v. Catignani*, 7 S.W.2d 38, 39 (Tenn. 1928). In determining the value of the life of the deceased, the jury should consider the deceased's age, health, life expectancy, personal habits, and capacity for work and earning money. *See Thrailkill*, 879 S.W.2d at 840. The factors "are to be modified by the fact that expectancy of life is, at most a probability, based upon experience, and also modified

16

by the fact that the earnings of the same individual are not always the same and uniform." *See Newman v. Simmons*, 62 Tenn. App. 610, 466 S.W.2d 506, 515 (1970).

In this case, Tammi Patterson's employers testified about her income and good work habits. Her employer at the time of her death testified that "her potential was good" and that she was "someone who looked like they had a lot going for them." Depperschmidt's testimony included Tammi Patterson's expected years in the workforce, lost wages until the time of trial of $33,087, and future lost earning capacity of $226,081.

Proof of the decedent's pain and suffering was presented to the jury. Williams testified how Tammi Patterson squeezed his hand while she was still trapped in the sand from Hardin's truck, and how her grip loosened after a few minutes. Dr. Smith described her physical injuries, including pressure marks on her chest, bruises and skin scrapes on her back, a fractured rib cage and spine, and small hemorrhages on the whites of her eyes and internal organs. He testified that the blood in her lungs and bleeding at injury sites indicated that she did not die instantaneously. Dr. Smith stated that squeezing Williams' hand indicated a voluntary action requiring consciousness. In his testimony, Dr. Smith described the perception of a person who is deprived of oxygen:

> When the person is denied oxygen, they feel a sense of the lack of oxygen. As the body then depletes the amount of oxygen it has in its stores, a condition known as air hunger can occur. And as a person becomes more and more anxious or desperate over the lack of oxygen, they enter into a very combative-like state in which they will wildly begin to thrash around or become combative.

In *Thrailkill*, the plaintiff filed a medical malpractice action for the death of his thirty-three-year-old wife after childbirth. *See Thrailkill v. Patterson*, 879 S.W.2d 836 (Tenn. 1994). The proof indicated lost earnings of $423,175.48 and pain and suffering which gradually increased prior to childbirth until the decedent went into a coma after childbirth and died four days later. The jury awarded $1,500,000, and this verdict was approved by the trial judge. The Court of Appeals remitted the judgment to $900,000, and the Tennessee Supreme Court reversed, reinstating the

17

original award of $1,500,000. *See id.* at 843. The Court in *Thrailkill* repeatedly emphasized the weight given to a jury verdict that has been approved by the trial judge:

> [T]his Court stated that the "amount fixed by the jury and concurred in the by the trial judge will be accepted upon appeal unless there is something to show a violation of the discretion" of the trial judge. We have also said that a jury verdict that has the trial judge's approval is entitled to "great weight," and that the appellate court "rarely ever" disapproves damages set in this manner.

*Thrailkill*, 874 S.W.2d at 840 (citations omitted) (quoting respectively *Wolfe v. Vaughn*, 152 S.W.2d 631, 635 (Tenn. 1941); *D.M. Rose & Co. v. Snyder*, 206 S.W.2d 897, 908 (Tenn. 1947); and *McClard v. Reid*, 229 S.W.2d 505, 507 (Tenn. 1950)). Based on this standard, the *Thrailkill*, court reinstated the judgment for $1,500,000, stating that it "[r]ecogniz[ed] that it is the jury's special province to evaluate damages and that a life cannot be defined with 'mathematical precision.' " *Id.* at 843.

In this case, the evidence indicated lost wages until the time of trial of $33,087, future lost earning capacity of $226,081, and funeral expenses of $5,560.20. The evidence indicated that Tammi Patterson was conscious for several minutes and endured substantial pain and suffering during that time, but that her death came relatively quickly. Based on this evidence, the jury awarded total damages of $625,045.

While this award is quite high considering the proof presented at trial, as in *Thrailkill*, "we are mindful of the trial judge's role as thirteenth juror in his approval of the jury's award." *Id.* at 843. The jury verdict is on the high end of the range of reasonableness, but we cannot say that the trial judge " 'failed to keep the jury within reasonable bounds.' " *Id.* at 840 (quoting *McClard v. Reid*, 190 Tenn. 337, 343, 229 S.W.2d 505, 507 (1950)). The trial court is affirmed on this issue.

The Teague Defendants also assert that the trial court should have granted either their motion for directed verdict or their motion for a new trial because the jury's assessment of 75% of the fault against the Teague Defendants was contrary to the weight of the evidence. They point to Hardin's testimony that he could not see Tammi Patterson's car from the cab of his truck, and did not want to abruptly get off the highway for fear of crushing the car between his truck and the guardrail.

"[T]he trier of fact has considerable latitude in allocating percentages of fault to negligent parties . . . ." *Wright v. City of Knoxville*, 898 S.W.2d 177, 181 (Tenn. 1995). Only where the trier of fact's findings are clearly erroneous may an appellate court alter those findings. *See id.*

Ample evidence was presented at trial from which the jury could have concluded that Hardin was seventy-five percent responsible for Tammi Patterson's death. A piece of the hub that covered the lug nuts from Hardin's truck found by Officer Briley was located at the approximate place where the deceased's car purportedly spun out of control. Moreover, Williams stated that Tammi Patterson's car was traveling straight down the highway and did not spin out of control until Hardin's truck entered the highway. From the evidence, the jury could have concluded that Hardin was responsible for the initial impact between his truck and Tammi Patterson's car. Officer Briley also testified that nothing prevented Hardin from moving his truck entirely off the road into the emergency lane. Hardin acknowledged that there was ample room in the emergency lane for him to drive his truck completely off the highway. In his testimony, Dunn stated that if Hardin had pulled entirely off the road, then Dunn would not have hit Hardin's truck. The Teague Defendants' expert, David G. Brown, admitted that the shoulder was wide enough for Hardin to pull his truck completely off the road and that if Hardin had pulled completely off the road, then this accident would never have happened. In this case, there was sufficient material evidence from which the jury could have concluded that the Teague Defendants were seventy-five percent responsible for Tammi Patterson's death. The decision of the trial court is affirmed on this issue.

The Teague Defendants also argue that the trial court erred in refusing to submit their jury verdict form to the jury. Their special verdict form consisted of eleven interrogatories. These interrogatories required the jury to consider each party's alleged negligence in relation to the other parties, including the dismissed parties, Williams and Haywood County. They contend that because the issues in the case were numerous and involved, their jury verdict form should have been submitted. The Plaintiff responds that the issues in this case were neither numerous nor involved, and did not warrant interrogatories in addition to the general verdict form. The trial court refused the Teague Defendants' requested special verdict form, which was entered as an exhibit at trial, reasoning that, by making a finding of fault, the jury would be in effect answering the interrogatories listed in the Teague Defendants' special verdict form.

Under Rule 49.02 of the Tennessee Rules of Civil Procedure, whether written interrogatories are submitted to the jury along with a general verdict form is a matter within the trial court's discretion: "The court may submit to the jury, together with appropriate forms for a general verdict written interrogatories upon one or more issues of fact the decision of which is necessary to a

19

verdict." Tenn. R. Civ. P. 49.02; *see also Mitchell v. Jennings*, 836 S.W.2d 575, 577 (Tenn. App. 1992). "[T]here is no abuse of discretion on the part of the trial court in refusing to submit special issues to the jury where the issues are neither numerous nor involved." *Mitchell*, 836 S.W.2d at 577 (citing *Hawthorne v. Lankes*, 430 S.W.2d 803, 805 (Tenn. App. 1968); *Shell Oil Co. v. Blanks*, 330 S.W.2d 569, 573 (Tenn. App. 1959)).

In *Mitchell*, a two-car collision resulted in the death of one passenger and injury to another passenger. A wrongful death action and a personal injury action were filed on behalf of the passengers against the two defendant drivers. After a jury verdict against them, the defendant drivers argued on appeal that written interrogatories should have been submitted to the jury. *See id.* at 576-77. The appellate court held that the failure of the trial court to submit interrogatories was not an abuse of discretion because the issues in the case were neither numerous nor complex. *See id.* at 577. The court noted, "In substance, we are considering a wrongful death claim and a personal injury claim on behalf of two passengers in a vehicle against two defendants . . . ." *Id.*; *see also Hawthorne v. Lankes*, 430 S.W.2d 803, 805 (Tenn. App. 1968) (finding special interrogatories were not necessary because the issues were neither complex nor involved).

In this case, the jury was required to assess fault among essentially four parties: (1) Hardin and the Teagues, (2) Dunn and Cowley, (3) Williams and Haywood County, and (4) Tammi Patterson. Beyond this, however, we cannot say that the issues of the parties' negligence were so numerous or involved that the trial court abused its discretion in refusing to give the jury special interrogatories. The decision of the trial court is affirmed on this issue.

Finally, the Teague Defendants argue that it was error for the trial court to allow the jury to consider the fault of Williams and Haywood County. The Teague Defendants note that the liability of Williams and Haywood County would be governed by the Tennessee Governmental Tort Liability Act, under which the trial court is required to make a determination of their fault. The Plaintiff responds that the objection is waived because there was no objection at trial until the Teague Defendants' motion for new trial. The Plaintiff also notes that the Teague Defendants' own proposed jury verdict form listed Williams.

During the trial, when the trial court stated that it was including Williams on the jury verdict form, the Teague Defendants did not object. Indeed, counsel for the Teague Defendants requested that a charge in the jury instructions be applied to Williams: "We would like, likewise, following

20

too closely and reckless driving on Billy Williams as well." Moreover, the Teague Defendants' proposed special jury verdict form lists Williams as one of the parties to whom the jury is to allocate fault. The first objection made by the Teague Defendants to the inclusion of Williams and Haywood County on the jury form was in their motion for a new trial filed after the jury verdict was entered. However, the Tennessee Rules of Civil Procedure provide that an objection to jury instructions is not waived where there is a failure to make objection until a motion for new trial. *See* Tenn. R. Civ. P. 51.02.

Under the Tennessee Government Tort Liability Act, where there are multiple defendants, and some are covered by the Act and some are not, the trial court shall sever the case and assess fault against the defendants covered by the Act, in accordance with the requirement that such entities receive a bench trial. *See* Tenn. Code Ann. § 29-20-307 (Supp. 1998); *Austin v. County of Shelby*, 640 S.W.2d 852, 854 (Tenn. App. 1982); *see also Arnold v. Ford*, No. 01-A-01-9505-CV-00203, 1995 WL 611280, at *3 (Tenn. App. Oct. 19, 1995); *Kirby v. Knox County, Tennessee*, No. 03A01-9211-CV-00409, 1993 WL 130134, at *1 (Tenn. App. Apr. 27, 1993); *Swafford v. City of Chattanooga*, 743 S.W.2d 174, 176 (Tenn. App. 1987). In this case, however, shortly after the trial began, Williams and Haywood County were dismissed from the lawsuit through a nonsuit.

Regardless, the jury in this case assessed no fault against Williams and Haywood County. The jury's assessment of fault was approved by the trial judge. A similar issue was addressed by the Tennessee Supreme Court in *Turner v. Jordan*, 957 S.W.2d 815, 823 (Tenn. 1997). In *Turner*, a nurse was attacked and beaten by a mentally ill patient in a hospital. *See id.* at 816. She brought suit against the psychiatrist, alleging that he was negligent in failing to medicate or restrain the patient. *See id.* at 818. The Tennessee Supreme Court found that the lower court incorrectly instructed the jury to compare the negligence of the defendant with the intentional act of the defendant's patient. *See id.* at 823. The error was held to be harmless, however, because the jury allocated zero fault to the patient. *See id.* In this case, the jury assessed no fault against Williams and Haywood County. This determination was approved by the trial judge. The Teague Defendants point to no prejudice resulting from the inclusion of Williams and Haywood County on the verdict form. Thus, even if it was error for the trial court to include Williams and Haywood County on the jury verdict form in this case, it must be deemed harmless error. This issue is without merit.

In sum, we find no abuse of discretion in the trial court's denial of a new trial to the Teague Defendants based on the Plaintiff's voluntary nonsuit in the presence of the jury. The trial court did not err in disallowing the introduction of the Plaintiff's pleadings against Dunn and Cowley. There was no error in the introduction into evidence of the funeral expenses. The Teague Defendants waived the objections raised on appeal to Depperschmidt's testimony. We find sufficient material evidence to support the amount of the jury verdict and its assessment of fault against the Teague Defendants. The trial court did not abuse its discretion by refusing the Teague Defendants' special jury verdict form. The inclusion of Williams and Haywood County on the jury verdict form was harmless error.

The decision of the trial court is affirmed. Costs are taxed to Appellant, for which execution may issue if necessary.


_____

_____ **HOLLY KIRBY LILLARD, J.**

**CONCUR:**


_____
**W. FRANK CRAWFORD, P. J., W.S.**


_____
**ALAN E. HIGHERS, J.**