Donald G. THRAILKILL, For Himself and as Next of Kin to Pamela A. Thrailkill, Deceased, Plaintiff/Appellant/Appellee,

v.

James K. PATTERSON, Rushton E. Patterson, and Rushton E. Patterson, Jr., d/b/a Patterson Gynecology & Obstetrics, A Partnership, Defendants/Appellees/Appellants.

Supreme Court of Tennessee, at Jackson.

June 27, 1994.

Duncan E. Ragsdale, Memphis, for plaintiff.

Jerry E. Mitchell, William H. Halton, Jr., Memphis, for defendants.

## OPINION

O'BRIEN, Justice.

In this medical malpractice action arising out of the defendants' care of Pamela Thrailkill, we are asked by both parties to review

the holding of the Court of Appeals, which upheld the finding of liability and of no reversible error in the conduct of the trial but remitted the jury's verdict of $1,500,000 to $900,000. Although both parties raise more than one issue, we are of the opinion that the central issue of this case is whether the Court of Appeals properly remitted the jury award. We find no reversible error in the conduct of the trial. Furthermore, we find liability to be clearly established; and we find material evidence to support the award of damages. Consequently, we reinstate the judgment of the trial court.

The plaintiff, Donald G. Thrailkill, is the husband of the decedent, Pamela Thrailkill, a thirty-three year-old woman pregnant with her first child. The plaintiff alleged the defendants, Dr. Rushton E. Patterson and his son, Dr. James K. Patterson, were guilty of medical malpractice in their care and treatment of Pamela Thrailkill. Specifically, Mr. Thrailkill alleged that the defendants failed to diagnose and treat a medical condition known as pre-eclampsia and that the alleged medical malpractice was the proximate cause of his wife's death.

Pre-eclampsia is a medical condition associated with pregnancy. Its symptoms include high blood pressure, protein in the urine and edema. A pre-eclamptic patient has a diminished circulatory blood volume which causes less oxygen to reach the vital organs. Swelling in a pre-eclamptic patient indicates fluid retention which can lead to pulmonary edema and cerebral edema. With appropriate treatment it is possible to arrest pre-eclampsia. However, if pre-eclampsia progresses into severe pre-eclampsia, physicians often must perform a cesarean section to remove the placenta, a procedure thought to relieve the symptoms of pre-eclampsia. Against this background we must assess the actions of the defendants.

Dr. Rushton Patterson was Pamela Thrailkill's obstetrician. He monitored her pregnancy from November of 1987 through 21 April 1988. On 14 March 1988, Mrs. Thrailkill complained to Dr. Rushton Patterson about swelling. Her blood pressure had increased since her last office visit. He instructed her to wear support panty hose for the swelling in her legs and ankles. On April 21, she returned to the clinic for a regular office visit. Since March 14 she had gained 18½ pounds; her blood pressure had increased; and her swelling had become more severe. Dr. Rushton Patterson testified that on April 21 he thought Mrs. Thrailkill might develop pre-eclampsia. He instructed her to stop working and to stay at home and rest. He prescribed Epsom salts (magnesium sulfate) to pull fluid out of her system and relieve the swelling. During this office visit, Dr. Rushton Patterson took only one blood pressure reading and urine sample. He testified that, in 1991, when a physician suspects pre-eclampsia, the standard of care requires two blood pressure readings and a 24-hour urine test. He was unsure of what the standard of care required in 1988.

On April 27, Mrs. Thrailkill drove herself to Patterson's office for a regular visit. Because Dr. Rushton Patterson was out of the office, Dr. James Patterson ("Dr. Patterson") saw her. She told him that she experienced nausea and vomiting during the night and that she felt ill. Her prenatal chart indicated that she had gained 23 pounds during the previous five weeks, that her blood pressure had increased, that her urine protein was 2+, and that she had swelling. Dr. Patterson testified at trial that Mrs. Thrailkill's urine test showed a trace to 2+ protein. Dr. Patterson prescribed Compazine suppositories for her nausea. Although he wrote in his office notes that he told Mrs. Thrailkill to go to the hospital if her nausea or headaches returned, he testified that he told her to go to the hospital when she was in his office. She left the Patterson office between 12:00 and 1:00 p.m. and returned home. She phoned her husband at work at 3:00 p.m., and he drove her to the hospital.

Mrs. Thrailkill arrived at the labor and delivery area of Baptist Memorial Hospital at approximately 4:00 p.m. Upon admittance, she was vomiting and experiencing severe headaches. Her blood pressure was 160/100;

her pulse was 100; and her temperature was 101.1. At 4:25 p.m. a nurse phoned Dr. Patterson to inform him that Mrs. Thrailkill was at the hospital. Dr. Patterson did not ask for her vital signs, and the nurse testified that she does not recall whether she told him that information. He ordered an IV of D5 RL 1000 ccs, run 200 cc load. "Load" is an instruction to run fluids quickly. The nurse testified that she and Dr. Patterson did not discuss at what rate she should run the IV fluids. Dr. Patterson testified that at 4:30 p.m. he suspected pre-eclampsia but did not diagnose it.

The nurse again phoned Dr. Patterson at 5:20 p.m. She informed him that Mrs. Thrailkill's urine showed a 4+ protein, that her blood pressure was high, and that she was experiencing swelling and headaches. The nurse testified to an order in which Dr. Patterson instructed her to increase IV fluids because he suspected dehydration. Dr. Patterson testified that he did not instruct the nurse to increase IV fluids.

At 5:30 p.m., Dr. Patterson gave instructions by phone to begin a magnesium sulfate protocol, part of a pre-eclampsia protocol. That protocol requires the main IV fluids to enter a patient's body from 50 to 75 ccs per hour to prevent the retention of fluids or possible development of pulmonary edema. Between 4:45 and 6:30 p.m., Pamela received 1400 ccs of fluid. The nurse testified that this fluid was run pursuant to Dr. Patterson's orders. Dr. Patterson testified that he most likely did not want Mrs. Thrailkill to receive 1000 ccs of fluid within one hour.

Dr. Patterson arrived at the hospital at 5:52 p.m. He contacted Dr. James Nunally, a resident in obstetrics and gynecology at the University of Tennessee, to assist him in the diagnosis and treatment of Mrs. Thrailkill. Between 6:00 and 7:00 p.m., Dr. Patterson and Dr. Nunally assessed her condition and ran diagnostic tests, including a chest x-ray. Another nurse testified that Mrs. Thrailkill had fluid in her lungs at 6:30 p.m.

Dr. Patterson testified that he decided to perform a cesarean section on Mrs. Thrailkill because he was concerned about the baby's condition. He ordered a "type and screen" to determine her blood type, but he did not order a "type and cross," which is an order to have blood ready and holding. Dr. Patterson testified that after a cesarean section many pre-eclamptic patients develop disseminated intravascular coagulopathy (DIC), a condition which causes bleeding due to improper blood clotting.

Prior to surgery, Mrs. Thrailkill was diagnosed with HELLP syndrome, a condition which develops from pre-eclampsia and causes a breakdown of red blood cells, an elevation of liver enzymes and low platelets. At 7:10 p.m. she was taken to the operating room where Dr. Patterson performed a cesarean section. Dr. Nunally assisted Dr. Patterson. Dr. Duggirala was the anesthesiologist, and Dr. Wilons apparently assisted with the respirator. Dr. Patterson delivered a healthy male infant at 7:23 p.m.

Both Dr. Nunally and Dr. Patterson continued to monitor Mrs. Thrailkill's condition. At 9:40 p.m. her abdominal dressing was saturated with blood in the lower right corner, and her blood pressure was 85/59. At 9:50 p.m. her blood pressure was 52/33. At 10:00 p.m. Dr. Nunally ordered packed red blood cells; and at 10:05 p.m. he cancelled this order and ordered fresh frozen plasma. Although Dr. Patterson did not order the blood, he testified that he was involved in the decision to order blood. At 10:15 p.m. an order was entered to transfer Mrs. Thrailkill to the intensive care unit where she arrived at 10:30 p.m. The transfusion of one unit of packed red blood cells began at 11:00 p.m. Apparently, Dr. Patterson was still involved in her care in the ICU. Dr. Holbort, a hematologist, Dr. Kelly, a kidney specialist, Dr. Land, an infectious disease specialist, and Dr. Parsons, a diagnostic radiologist, were also involved while she was in the ICU. Dr. Kelly testified that when he saw Mrs. Thrailkill on April 29 she had acute oliquric renal failure and fluid volume overload. Dr. Parsons testified that on April 30 he observed fluid in her abdomen.

Mrs. Thrailkill went into a coma four days after surgery; she never regained conscious-

ness and died on May 7, 1988. Dr. Kenneth Grosshart performed an autopsy and determined that the cause of her death was multiple organ failure related to pre-eclamptic health syndrome. He testified that the bleeding following the C-section caused her period of low blood pressure which prevented oxygen from reaching vital organs. Dr. John Schweitzer, a neuropathologist, performed an autopsy on her brain. Dr. Schweitzer testified that the autopsy revealed cerebral edema or a swelling of the brain due to excess fluids. He also testified that the condition of the brain indicated a failure to receive either the right amount of oxygen or blood flow.

Several medical experts testified at trial. Dr. James Dingfelder, an expert for the plaintiff, testified that Dr. Rushton Patterson's failure to begin some type of testing for pre-eclampsia in late March and early April fell below the standard of care. He testified that the standard of care, relative to the April 21 office visit required at least a further investigation into Mrs. Thrailkill's blood pressure and protein in the urine. He testified that if those additional tests revealed the same results as those actually taken she should have been hospitalized. Dr. Dingfelder also testified that Dr. Patterson's disregard of his patient's weight gain failed to meet the standard of care.

Dr. Dingfelder testified that, given the information in Mrs. Thrailkill's prenatal chart and given her symptoms on April 27, Dr. Patterson should have investigated further. He testified that Dr. Patterson's failure to ask about her vital signs at 4:20 p.m. fell below the standard of care. He testified that at 4:20 p.m. Dr. Patterson should have been at the hospital and that a magnesium sulfate infusion should have been administered. Dr. Dingfelder testified that the amount of fluids Mrs. Thrailkill received between 4:45 and 5:20 p.m. fell below the standard of care because she was showing signs of very low urine output which increased the risk of fluid overload. He also testified that Dr. Patterson should have delayed surgery until the pulmonary edema was resolved and a hematologic consultation was completed to determine the need for blood product replacement. Dr. Dingfelder stated that each of the aforementioned deviations from the standard of care either contributed to or was the proximate cause of Mrs. Thrailkill's death.

On 1 October 1991, the jury returned a verdict in favor of the plaintiff and against the defendants in the amount of $1,500,000. On November 8, the trial judge denied the defendants' motion for a new trial or for remittitur and found specifically:

> That the amount of the jury's verdict herein is within the scope of reasonableness as established by the credible proof;

> That as a matter of fact the evidence preponderates in favor of the Plaintiff; and

> There was material evidence to support the jury's verdict.

The Court of Appeals found the trial to be fair, denying the defendants' claims of reversible error; however, the Court of Appeals remitted the jury's judgment to $900,000. While we agree that there was no reversible error in the conduct of the trial and that liability was clearly established, we cannot agree with the remittitur ordered by the Court of Appeals and reinstate the trial court's award of $1,500,000.

The defendants argue that the Court of Appeals' correction in the size of the verdict amounts to a destruction of the jury verdict and mandates a new trial. They seek a new trial based on their position that the amount of the verdict was so far beyond the range of reasonableness that the inescapable conclusion is that the jury ignored the court's instructions and returned a verdict that was the product of passion, prejudice, and caprice.

We necessarily turn our attention not only to the proof of damages at trial and to the standard of reviewing the elements of a damage award in a personal injury case but also to the standard of review when the jury's verdict is approved by the trial court.

The trial court correctly charged the jury that there are two classes of damages that

may be awarded including (1) mental suffering, physical suffering and funeral expenses and (2) the value of the life of the deceased considering age, condition of health, life expectancy, personal habits, and strength and capacity for work and for earning money. The jury was instructed to deduct from the value of the life what Mrs. Thrailkill had to spend to keep herself in such a condition to work.

Court review of excessiveness of damages is tied to the practice of remittitur. This practice was developed to cure excessive verdicts without the costly and time-consuming process occasioned by the granting of a new trial. *Alabama Great S.R.R. v. Roberts,* 113 Tenn. 488, 493, 82 S.W. 314, 315 (1904); *see generally,* Comment, 24 Tenn.L.Rev. 1155 (1957).

■ In 1911 the Tennessee Legislature enacted what is now T.C.A. § 20–10–102 concerning remittitur. In 1969 an additur statute was enacted—T.C.A. § 20–10–101. The purpose of these acts was to allow trial and appellate courts to revise and correct errors relating to the size of a jury's verdict. The statutes recognize the inherent power of trial courts to "suggest" an additur or remittitur as an alternative to a new trial. This Court has held that a jury verdict found to be excessive may be cured by remittitur. *Poole v. Kroger Co.,* 604 S.W.2d 52 (Tenn.1980). Courts are encouraged to exercise caution in ordering a new trial based on the size of a jury verdict and should, if at all possible, utilize the remedy of remittitur. *Pitts v. Exxon Corp.,* 596 S.W.2d 830 (Tenn.1980); *Jenkins v. Commodore Corporation Southern,* 584 S.W.2d 773 (Tenn.1979); *Guess v. Maury,* 726 S.W.2d 906 (Tenn.App.1986).

This Court outlined its views on the impact of the trial judge's decision in evaluating the excessiveness of a jury verdict over a century ago. In *Tennessee Coal & R.R. v. Roddy,* 85 Tenn. 400, 5 S.W. 286 (1887), the trial judge stated that he felt the judgment was excessive, but, nevertheless, sustained it "to terminate the litigation in this case, ... this Court

having tried the case for the third time." *Id.* at 402, 5 S.W. at 287. We refused to set aside the judgment on appeal, holding that it was the responsibility of the trial judge to do so if he thought it proper. As we stated: "Much of the importance and weight attached to jury trials proceeds from the presumption that an intelligent and learned Circuit Judge, accustomed to weighing evidence, has scrutinized the proof, looked into the faces of the witnesses, and indorsed the action of the jury." *Id.* at 403, 5 S.W. at 288.

This same philosophy continued after remittitur had become recognized as a method of curing excessive verdicts as an alternative to a new trial. In *Wolfe v. Vaughn,* 177 Tenn. 678, 688, 152 S.W.2d 631, 635 (1941), this Court stated that the "amount fixed by the jury and concurred in by the trial judge will be accepted upon appeal unless there is something to show a violation of the discretion" of the trial judge. We have also said that a jury verdict that has the trial judge's approval is entitled to "great weight," *D.M. Rose & Co. v. Snyder,* 185 Tenn. 499, 525, 206 S.W.2d 897, 908 (1947), and that the appellate court "rarely ever" disapproves damages set in this manner. *McClard v. Reid,* 190 Tenn. 337, 343, 229 S.W.2d 505, 507 (1950). We again emphasized the responsibility of the trial judge in determining whether the amount fixed by a jury is excessive: "After he has approved the verdict it is our duty not to disturb it unless it is evident that he failed to keep the jury within reasonable bounds."

Much of the case law governing the use of additur and remittitur centers on a review of the trial judge's use of these tools to avoid a new trial rather than on a review of the trial judge's approval of the jury's verdict. *See generally, Foster v. Amcon Int'l, Inc.,* 621 S.W.2d 142, 144–145 fn. 4 and 5 (Tenn.1981).

In *Foster, supra,* in an effort to dispel some of the inconsistency and confusion in past decisions, we reviewed at length the standard to be applied when a trial court or appellate court is faced with the issue of either additur or remittitur. While *Foster*

involved an issue of additur by the trial judge, we specifically made applicable our comments to the use of remittitur as well. *Foster,* 621 S.W.2d at 143, n. 2. Specifically, we found that the Court of Appeals has the duty to review the proof of damages and the authority to reduce an excessive award when the question of remittitur is raised.

However, more recently the legislature has laid to rest any question about the standard of review in the Court of Appeals on additur or remittitur by enactment of Ch. 232 of the Public Acts of 1987, T.C.A. §§ 20–10–101(b)(2) and 20–10–102(b) to provide that . T.R.A.P. 13(d) shall apply.

T.R.A.P. 13(d) mandates in pertinent part:

(d) Findings of Fact in Civil Actions.— Unless otherwise required by statute, review of findings of fact by the trial court in civil actions shall be de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise. Findings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict.

The courts are in agreement upon a primary guideline relevant to the issue of damages. In *Reeves v. Catignani,* 157 Tenn. 173, 7 S.W.2d 38 (1928), this Court said:

The amount of the verdict is primarily for the jury to determine, and next to the jury the most competent person to pass upon the matter is the judge who presided at the trial and heard the evidence. 157 Tenn. at 176, 7 S.W.2d at 36.

█ As provided by the wrongful death statutes, the party suing shall have the right to recover for mental as well as physical suffering, loss of time, and necessary expenses resulting to the deceased from personal injuries. *See* T.C.A. §§ 20–5–106, 20–5–107, 20–5–113; *see generally,* T.A. Smedley, "Wrongful Death Actions in Tennessee," 27 Tenn.L.Rev. 447 (1960). This recovery is based upon the pecuniary value of the life of the deceased to be determined upon a consid-

eration of his expectancy of life, his age, condition of health and strength, capacity for labor and for earning money through skill in any art, trade, profession, and occupation or business. *Memphis Street Ry. v. Cooper,* 203 Tenn. 425, 313 S.W.2d 444 (1958); *Interstate Life & Accident Co. v. Cox,* 55 Tenn. App. 40, 396 S.W.2d 80 (1965); *Bellamy v. Sadler,* 640 S.W.2d 20 (Tenn.App.1982). Thus, in an action by a husband for damages for the wrongful death of his wife, the measure of recovery is the pecuniary value of the life of the wife to the husband, and not what wages the wife might have been able to earn, nor merely what it would have taken to hire another to do the work she did, as such basis of recovery would overlook the value of the wife's personal interest in the affairs of the home and the economy incident to her services. *Knoxville Ry. & Light Co. v. Davis,* 3 Tenn.Civ.App. (Higgins) 522 (1912); *see also Wilkerson v. Altizer,* 845 S.W.2d 744, 749 (Tenn.App.1992) ("In a wrongful death action, if liability is established,recoverable under Tennessee Code Annotated, Section 20–5–113 consist of two classes: 1) damages purely for injury to the deceased embraces damages for mental and physical suffering, loss of time and necessary expenses resulting to the deceased from personal injury, and 2) incidental damages suffered by the next of kin from the death. These incidental damages include the pecuniary value of the life of the deceased." (Citations omitted). However, the assessment of damages is not governed by fixed rules of mathematical precision, but the matter is left to the sound discretion of the jury); *Illinois Cent. R. v. Spence,* 93 Tenn. 173, 23 S.W. 211 (1893); *Brown v. Ellison,* 12 Tenn.App. 27 (1926); *Crowe v. Provost,* 52 Tenn.App. 397, 374 S.W.2d 645 (1963) (amount of damages in a death action is a matter dependent most largely upon the judgment of the jury and their sound discretion after carefully, honestly and fairly considering all various elements that enter into the question); *Strother v. Lane,* 554 S.W.2d 631, 636 (Tenn.App.1976) (since no rule exist by which to measure the value of a life, the jury is in the best position to assess damages and, next to the jury, the

trial judge is in the best position to evaluate damages; and great weight must be given to the judgment of the jury and the trial judge in the absence of any showing of misconduct). In *Hall v. Nash*, 184 Tenn. 312, 198 S.W.2d 649 (1947), we held that whether the decedent lived a few minutes after the accident so as to have suffered any pain as to authorize an award of damages was a question for the jury. In the present case, the decedent died four days after her cesarean operation; and proof was presented regarding her pain and suffering both prior to and after her operation.

■ In our evaluation of the case before us, we find that there was ample proof of pain and suffering of the decedent presented to the jury on which they could base their award. The plaintiff introduced evidence of Mrs. Thrailkill's mental and physical suffering beginning on 14 March 1988, when she developed 1+ protein, had swelling and edema, and was prescribed support hose. The plaintiff showed a weight increase of 3 to 5 pounds per week for each week beginning on 14 March 1988. On 21 April 1988, she had a 12.25 pound weight gain with protein in the urine, swelling and edema. Mr. Thrailkill testified that his wife suffered from the early part of April until she went into a coma on or about 1 May 1988. He also stated that she held her baby after delivery and, with tubes in her mouth, signed "I love you." A summary of her injuries include the following:

Untreated swelling and edema since March 14, 1988;

Untreated weight increase since March 14, 1988;

Untreated pre-eclampsia since April 21, 1988;

She felt terrible from early April until April 23, 1988;

Had nausea, vomiting, diarrhea on April 26 and 27;

Severe headache on April 27;

Cerebral edema—swelling of the brain—April 27 until her death;

Increased respiratory rate—hyperventilation—April 27 until death;

Pulmonary edema—drowning with water in lungs—April 27 until death;

Pneumonia beginning on April 17;

Septicemia beginning April 27 until death;

Intubated April 17 until death;

Needle inserted in abdomen to check for blood;

Lumbar puncture;

Hemodialysis;

Large anterior wall hematoma producing bloody peritoneal fluid;

Peritonitis—infection in abdomen;

Hemorrhagic pleural effusions—bleeding in lungs;

Large hematoma of right lobe of liver;

Focal renal necrosis—kidney infarcts from hypotension;

Bowel ischemia and erosions;

Subendocardial hemorrhage;

Ischemic pancreatitis;

Enlarged heart;

Multiple organ failure;

Disseminated intravascular coagulopathy;

Hypoglycemia;

Fever;

Rapidly worsening mental status;

Dialysis for renal failure;

Fungal or bacterial sepsis;

Consciousness for four days following April 27, 1988;

Held her child while on respirator;

Couldn't speak—could only sign "I love you" to her husband.

Mrs. Thrailkill was 33-years-old, had a life expectancy of 45.5 years, made $9,311 in 1987 and, without a computation for inflation, would have earned $423,175.48 during the course of her life. Her funeral expenses were $7,000.

Recognizing that it is the jury's special province to evaluate damages and that a life cannot be defined with "mathematical precision", we do not find the award to be excessive but rather that it stemmed legitimately and naturally from the tragic facts of the suffering and death of Mrs. Thrailkill which were preventable by proper medical care. Additionally, we are mindful of the trial judge's role as thirteenth juror in his approval of the jury's award. We find de novo on the record that the jury's verdict conformed to the requirements of T.R.A.P. 13(d), and reinstate the original award of $1,500,000. Costs of appeal are taxed to the defendants.

REID, C.J., and DROWOTA and ANDERSON, JJ., concur.

DAUGHTREY, J., not participating.