IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
January 17, 2007 Session

## JENNIFER DUNN, Individually and as the natural mother and next of kin to JEREMIAS DUNN, deceased v. AMELIA DAVIS

**Direct Appeal from the Circuit Court for Shelby County**
**No. CT-006516-01     Karen R. Williams, Judge**

---

**No. W2006-00251-COA-R3-CV - Filed March 6, 2007**

---

This appeal arises from a wrongful death action tried by a jury. The jury allocated 51% fault to Defendant and assessed total damages in the amount of $1,250,000. The trial court denied Defendant's motions for new trial, remittitur, and judgment in accordance with motion for directed verdict; entered judgment against Defendant in the amount of $637,500; and awarded Plaintiff discretionary costs. Defendant appeals. We affirm in part, reverse in part, and remand with suggestion of remittitur.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in part; Reversed in part; and Remanded**

DAVID R. FARMER, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and ALAN E. HIGHERS, J., joined.

Nicholas E. Bragorgos and Pamela Warnock Green, for the appellant, Amelia Davis.

John Daniel Richardson, Teresa A. Boyd, and Julian T. Bolton, for the appellee, Jennifer Dunn.

**OPINION**

This appeal arises from a wrongful death action stemming from a tragic motor vehicle accident. On September 27, 2001, thirteen-year old pedestrian Jeremias Dunn (Jeremias) was killed while walking home from school when he was struck by a white Tahoe (SUV) operated by Defendant Amelia Davis (Defendant or Ms. Davis), then eighteen years of age. The accident occurred at approximately 2:57 pm as Jeremias and at least one other child were crossing Union Avenue from the southwest corner to the northwest corner of Union Avenue and Hollywood/Alicia in Memphis. The traffic light was green for Jeremias as he began his journey across Union Avenue, but apparently changed when he entered the turning lane in the center of Union Avenue. Jeremias

and at least one other child attempted to run across the remainder of Union Avenue. Ms. Davis's vehicle struck Jeremias as he entered the westbound, far right (curb-side) lane.

When the accident occurred, Ms. Davis was on her way to her after-school job at Idlewild Day Care. She was traveling at approximately thirty-five miles per hour in heavy traffic and had moved into the far right lane sometime after crossing the viaduct east of the intersection of Union and Hollywood/Alicia. The day of the accident was clear and hot, and there is no evidence that visibility was limited by weather conditions. The parties dispute whether Jeremias was crossing within the crosswalk and whether Ms. Davis's view of the other lanes was obstructed by a U-Haul truck, but the traffic light was green for Ms. Davis as she entered the intersection. There is no evidence that Ms. Davis ran a red or yellow traffic signal, that she was traveling at an excessive rate of speed, or that she was impaired by the use of drugs or alcohol when the accident occurred. Additionally, cellular telephone records demonstrated that Ms. Davis was not on her cell phone at the time of the accident. Jeremias died from severe head and neck trauma within thirty minutes of being struck. There is no evidence to suggest that Jeremias was conscious or alert when the paramedics arrived approximately thirteen minutes after Jeremias was struck by Ms. Davis's vehicle.

On October 24, 2001, Jeremias's parents, Plaintiffs Jennifer Dunn (Ms. Dunn) and William Dunn (Mr. Dunn, collectively, "the Dunns"), filed a wrongful death action individually and as next of kin against Ms. Davis. In their complaint, the Dunns alleged the accident was proximately caused by negligence on the part of Ms. Davis. They claimed medical and funeral expenses; loss of consortium; diminished capacity to enjoy life, and great mental anguish. They also claimed extreme pain and suffering, loss of life (pecuniary value) and loss of earning capacity on the part of Jeremias. They prayed for individual damages in the amount of $1,000,000 each and damages in the amount of $5,000,000 as next of kin.

Ms. Davis answered, denying allegations of negligence. The Dunns subsequently amended their complaint to add the owners of Ms. Davis's vehicle, her parents Charles and Mary Davis ("the Davises"), pursuant to the family purpose doctrine and respondeat superior. They further alleged the Davises "either knew or should have known that [Ms. Davis] was an unsafe driver and under medication, specifically Aderal." The Dunns also added the City of Memphis ("the City") as a Defendant, alleging negligent adjustment of the traffic control light that resulted in inadequate crossing time, and inadequate signage. The City moved for summary judgment and, following a hearing, the trial court granted the City partial summary judgment with respect to matters relating to the timing or programming of the traffic and pedestrian control signals. In March 2005, the Dunns took a voluntary non-suit as to the City. They also non-suited the claims of Mr. Dunn and all claims against the Davises. The trial court dismissed Mr. Dunn and claims against the Davises on July 5, 2005.

The matter was tried before a jury on July 5-7, 11, 12, and 14, 2005. The jury returned a verdict allocating 51% fault to Ms. Davis and assessing total damages in the amount of $1,250,000. The trial court entered judgment on the jury verdict in favor of Ms. Dunn in the amount of $637,500 (51% of 1,250,000) plus costs. Thereafter, the trial court granted Ms. Davis's motions for directed

verdict on Ms. Dunn's loss of consortium claim, and denied Ms. Davis's motions for directed verdict with respect to Ms. Dunn's negligence claims.

Ms. Davis moved for a new trial, remittitur, and judgment in accordance with motion for directed verdict, and Ms. Dunn moved for prejudgment interest. The trial court denied these motions. The trial court awarded Ms. Dunn discretionary costs in the amount of $13,659.52. Final judgment was entered in the matter on January 3, 2006, and Ms. Davis filed a timely notice of appeal to this Court. We affirm the verdict allocating 51% fault to Ms. Davis; reverse the trial court's denial of Ms. Davis motion for remittitur; and remand with a suggestion of remittitur in the amount of $598,768. We affirm the trial court's award of discretionary costs to Ms. Dunn.

### *Issues Presented*

Ms. Davis raises several issues, as we slightly restate them, for our review:

(1)    Whether the trial court erred by denying Defendant's motion for a new trial because the verdict is contrary to the law, evidence, and jury instructions.

(2)    Whether the trial court erred by denying Defendant's motion for judgment in accordance with motion for directed verdict at the close of Plaintiff's proof and at the close of all the evidence.

(3)    Whether the trial court erred by denying Defendant's motion for remittitur because the verdict is contrary to the law and evidence.

(4)    Whether the trial court erred in admitting into evidence a photograph of Jeremias through the testimony of Plaintiff's witness George Cole; in admitting the testimony of Plaintiff's expert traffic accident reconstructionist; and in excluding an excerpt of a letter from Plaintiff's counsel to Plaintiff's expert, offered to show bias or motive.

(5)    Whether the trial court abused its discretion in awarding Plaintiff's discretionary costs and denying Defendant's motion to strike excerpts of the affidavit of legal counsel Julian Bolton.

### *Standard of Review*

On appeal from a jury trial, we will not set aside the jury's findings of fact unless there is no material evidence to support the verdict. *Childress v. Union Realty Co.*, 97 S.W.3d 573, 576 (Tenn. Ct. App.2002); Tenn. R. App. P. 13(d). Upon review, this Court will not re-weigh the evidence, but will take the strongest view possible of the evidence in favor of the prevailing party, and discard evidence to the contrary. *Id.* We will allow all reasonable inferences to uphold the jury's verdict, setting it aside only if there is no material evidence to support it. *Id.*

Our review of the trial court's conclusions of law in a jury trial, however, is *de novo* upon the record, with no presumption of correctness. Tenn. R. App. P. 13(d)*; Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 28 (Tenn. 1996).

### *Motion for Judgment in Accordance with Motion for Directed Verdict*

We begin our analysis with whether the trial court erred by denying Ms. Davis's motion for judgment in accordance with motion for directed verdict at the close of Plaintiff's proof and at the close of all the evidence. It is well-established that to establish negligence the plaintiff must prove: (1) a duty of care owed by defendant to plaintiff; (2) conduct falling below the applicable standard of care that amounts to a breach of that duty; (3) injury or loss; (4) cause in fact; and (5) proximate, or legal, cause. *McClung v. Delta Square Ltd.*, 937 S.W.2d 891, 894 (Tenn. 1996). Once the court has determined that the defendant in a negligence action owes plaintiff a duty, the question of whether the defendant has breached his duty and thereby caused plaintiff's injury are matters to be determined by the finder of fact*. Patterson-Khoury v. Wilson World Hotel-Cherry Road*, 139 S.W.3d 281, 285 (Tenn. Ct. App 2003). The courts have defined duty of care as "the legal obligation owed by defendant to plaintiff to conform to a reasonable person standard of care for protection against unreasonable risks of harm." *McClung*, 937 S.W.2d at 894.

Although negligence is not presumed from the mere fact that plaintiff has suffered an injury, when different conclusions may be reached regarding fault, the question is one to be decided by the jury. *Hickman v. Jordan*, 87 S.W.3d 496, 499 (Tenn. Ct. App.2001). Thus, a directed verdict is appropriate when the evidence is susceptible to only one conclusion. *Nee v. Big Creek Partners*, 106 S.W.3d 650, 653 (Tenn. Ct. App.2002)(citing *Alexander v. Armentrout*, 24 S.W.3d 267, 271 (Tenn.2000)). This conclusion, however, cannot be based on speculation, conjecture, or guesswork. *Id.* If reasonable persons could draw conflicting conclusions on issues of fact, the matter should go to the jury. *Id.*

Our review of a trial court's determination regarding a motion for directed verdict is well-settled. When deciding whether a trial court should have granted a directed verdict, we must take the strongest legitimate view of the evidence in favor of the opponent of the motion. *Id.* Further, we must allow all reasonable inferences in favor of the opponent of the motion and disregard all evidence contrary to the opponent's position. *Id.* Our review of a trial court's decision regarding a post-trial motion for entry of judgment in accordance with a motion for a directed verdict made during the trial is gauged by the standard applicable to motions for directed verdict. *Holmes v. Wilson*, 551 S.W.2d 682, 685 (Tenn. 1977)(citations omitted). Accordingly, in this case, we must affirm the trial court's determination unless there is no material evidence to support the jury's determination that Ms. Davis was 51% at fault.

Our analysis of this issue in light of comparative fault principles requires a two-part inquiry. *See Eaton v. McLain*, 591 S.W.2d 587, 590-93 (Tenn. 1994)(holding that where both plaintiff and defendant have been found negligent, the finder of fact must determine whether the fault attributable to the defendant is greater than that attributable to the plaintiff). First, we must determine whether

there is any material evidence in the record to support a finding that Ms. Davis was negligent. Second, if material evidence supports such a finding, we must determine whether any material evidence supports the jury's determination that Ms. Davis was 51% at fault. The percentage of fault to be attributed to each party is dependent on the entirety of the circumstances, and factors to be considered by the jury include

> (1) the relative closeness of the causal relationship between the conduct of the defendant and the injury to the plaintiff; (2) the reasonableness of the party's conduct in confronting a risk, such as whether the party knew of the risk, or should have known of it; (3) the extent to which the defendant failed to reasonably utilize an existing opportunity to avoid the injury to the plaintiff; (4) the existence of a sudden emergency requiring a hasty decision; (5) the significance of what the party was attempting to accomplish by the conduct, such as an attempt to save another's life; and (6) the party's particular capacities, such as age, maturity, training, education, and so forth.

*Id.* at 592. We note, however, that "challenging a jury's allocation of fault is the legal equivalent of a 'Hail Mary' pass." *Braswell v. Lowe's Home Centers, Inc.*,173 S.W.3d 41, 43 (Tenn. Ct. App. 2005). If material evidence supports a finding of negligence, "[t]he comparison and allocation of fault is for the jury." *Id.* (citing *Brown v. Wal-Mart Discount Cities*, 12 S.W.3d 785, 789 (Tenn. 2000)). We will not second-guess the allocation of fault by a jury if it is supported by any material evidence. *Id.*

With these principles in mind, we turn to whether any material evidence supports a finding that Ms. Davis was negligent. It is clear from the evidence that at the time this accident occurred Ms. Davis was not speeding, was not operating under the influence, was not on her cell phone, and that the traffic light was green in her direction. It is also clear that Ms. Davis was traveling in heavy traffic and that Jeremias was in the traffic lanes of Union Avenue at or near the cross walk as Ms. Davis approached the intersection of Union Avenue and Hollywood/Alicia. Additionally, Ms. Davis does not dispute that she was under a duty to maintain a reasonably safe speed; to have her vehicle under control; to keep a proper lookout under the circumstances; and to use reasonable care to avoid an accident. Ms. Davis maintains in her brief to this Court, however, that, although she observed children on the sidewalk at the time of the accident, she did not see Jeremias until he was "in the middle of her car," that Jeremias was not crossing within the crosswalk, that she could not see Jeremias because a U-Haul truck blocked her view. Ms. Dunn, on the other hand, asserts Jeremias was in the crosswalk at the time of the accident, that Ms. Davis should have been aware children were present, and that she should have seen Jeremias, and that the U-Haul truck traveling near Ms. Davis did not block her view.[1]

---

[1] As we understand Ms. Dunn's argument, there is no allegation in this case that Ms. Davis saw Jeremias and was unable to stop in time to avoid hitting him. Rather, the question centers on whether Ms. Davis should have observed Jeremias in the street in the first instance.

After reviewing the entire trial transcript, we affirm the trial court's denial of Ms. Davis motion for directed verdict and motion for judgment in accordance with her motion for directed verdict. The two major factual determinations relevant to this issue, as we perceive them, are whether Jeremias was within the crosswalk when the accident occurred and, more importantly, whether anything obstructed Ms. Davis's view of Jeremias. The record contains material evidence to support both parties' contentions regarding these questions, and we agree with the trial court that reasonable persons could reach different conclusions.

Ms. Davis testified that when she first saw Jeremias, he was running and was "in the middle" of her car. She testified that she did not observe children in the street; that she did not see Jeremias to her left; and that Jeremias appeared to have "leapt" in front of her car. Ms. Davis also testified that the traffic was heavy and that she could not have seen Jeremias to her left because cars were to her left. Ms. Davis further testified that she did not remember whether there was a truck in the lane to the left of her, although there could have been.

Witness Lula Yancy (Ms. Yancy) is a retired nurse who was traveling westbound on Union in a maroon vehicle at the time of the accident and who stopped to help Jeremias after the accident. Ms. Yancy testified that she observed only one child crossing Union; that he was running; that she slammed on her brakes to avoid hitting the child; and that the child was crossing Union Avenue "at least two car lengths" west of the crosswalk. Ms. Yancy also testified that she did not witness the impact, and that she heard it rather than saw it. Ms. Yancy additionally testified that she did not see a U-Haul truck.

Witness Bridget Clark (Ms. Clark) was traveling west on Union to pick her children up from school at the time of the accident. Ms. Clark testified that she was traveling in the far left lane of the westbound lanes and that she observed children beginning to cross the eastbound lanes as she came across the viaduct. She testified that children were running in the street and drifting in and out of the traffic in the eastbound lanes, and that the traffic light changed after the children had started to cross. Ms. Clark testified that she and Ms. Davis entered the intersection at about the same time; that a large truck was in the lane between her and Ms. Davis; and that they had crossed the crosswalk when the children started to run across the westbound lanes. Ms. Clark testified that Ms. Davis's view of the children would have been blocked by the large U-Haul type truck. She testified that the car in front of her slammed on its brakes to avoid hitting one child; that one child made it across the street; and that she slammed on her brakes to avoid hitting the second child, Jeremias. She testified that she did not see Ms. Davis strike Jeremias because her view was blocked by the truck. She testified that the truck in the middle lane was slightly ahead of Ms. Davis and that she was slightly behind Ms. Davis within their respective lanes. Ms. Clark also acknowledged that at her earlier deposition she stated that the remembered the vehicle that struck Jeremias as being a blue Tahoe, when in fact it was white.

Police Sargent George Olive, (Sargent Olive) who was part of the investigation team, testified that he did not believe that Jeremias was in the crosswalk when the accident occurred. He testified that he was not an accident reconstructionist and that he had relied not on scientific data but

on police work and common sense in reaching his conclusion based on the circumstances. Sargent Olive testified that he believed Jeremias was eighty-one feet from the intersection when the accident occurred.

On the other hand, witnesses Jonathan Johnson (Mr. Johnson) and Terrance Pope (Mr. Pope), Jeremias's schoolmates, testified that Jeremias attempted to cross within the crosswalk and that the crossing signal was green for Jeremias when he began to cross Union Avenue. Mr. Johnson testified that only he and Jeremias were crossing Union Avenue, but that other schoolmates, including Mr. Pope, were in the area. He further testified that the two boys did not see any vehicles coming when they began to cross, and that "out of nowhere, a maroon-colored car come flying through, so we dodged it and kept going and Jeremias got hit." At trial, Mr. Johnson testified the accident happened in the far right lane although he had stated at his March 6, 2002, deposition that the impact occurred in the middle of the three westbound lanes. Mr. Johnson also testified at trial that he did not remember that the "lady in the maroon-colored car," Ms. Yancy, stopped to help at the accident scene, although he stated in his deposition that he believed that she did. Mr. Johnson also testified that the boys generally did not cross Union Avenue, but usually went under the viaduct; that Jeremias chose to cross Union on the day of the accident; that they ran across the street although the light was green for them to cross; and that Jeremias and he both dodged the maroon-colored car. Mr. Pope testified that he saw Jeremias as he was struck and that Jeremias was in the crosswalk. He also testified that he ran through traffic, and not at the crosswalk, to reach Jeremias after the accident.

Witness Linda Keeley (Ms. Keeley), a probation officer, was traveling east on Union at the time of the accident. Ms. Keeley testified that she was stopped behind three cars while the traffic light was red for the Union Avenue traffic, and that she observed Jeremias running alone across Union Avenue within the crosswalk. She testified that the traffic light changed as Jeremias was running ahead of traffic in the crosswalk, and that he was almost across the street when the light changed. Ms. Keeley also testified that she did not view the actual impact and that she could not see it because there were cars to her left. When asked how she was able to observe that Jeremias was within the crosswalk when she was in the fourth car from the light, and whether she was assuming that he was in the crosswalk, Ms. Keeley responded: "[t]hat's what I saw, he was in front of the traffic, so, yes, he was in the crosswalk." Ms. Keeley also testified that she saw no other pedestrian cross the street after traffic stopped after the accident. Ms. Keeley additionally testified that she was a friend of Julian Bolton's (Plaintiff's attorney) sister, and that she contacted Mr. Bolton after learning about the lawsuit at a birthday party for Mr. Bolton's sister's baby.

Janie Hines (Ms. Hines) was traveling westbound on Union in an SUV ahead of the U-Haul truck in the middle lane. The U-Haul was driven by Ms. Hines' son, who was following her. Ms. Hines testified that she stopped at the intersection of Union and Hollywood/Alicia when the traffic light was red, and that when she proceeded through the light after it turned green Jeremias had already been hit. She testified that she did not see the accident; did not know the location of Ms. Davis vehicle; and that her son was in the U-Haul behind her when the traffic light turned green.

Plaintiff's expert accident reconstructionist, Larry Williams (Dr. Williams) testified that based on a traveling speed of thirty-five miles per hour; a fifty-eight foot brake-to-stop time of the Tahoe at that speed; the point at which the Tahoe came to rest; and a perception-reaction time of .75 to 1.5 seconds, Jeremias was within or near the crosswalk when the accident occurred.

The evidence presented in this case supports a variety of determinations, and the testimony and credibility of each witness was thoroughly examined and cross-examined. The determination of whether Jeremias was in fact within the cross at the time of the accident; whether Ms. Davis's view of Jeremias was blocked by a U-Haul-like truck; and whether Ms. Davis was 51% at fault in this case are matters of credibility and the weight assigned by the jury to the evidence presented to it. On an appeal from a jury verdict, we do not determine the credibility of witnesses or weigh the evidence. *Brown v. Daly*, 83 S.W.3d 153, 156 (Tenn. Ct. App.2001). Accordingly, we affirm the trial court's denial of Ms. Davis's motions for directed verdict and for judgment in accordance with motion for directed verdict.

### *Motion for New Trial/Motion for Remittitur*

Ms. Davis asserts the trial court erred by denying her motion for a new trial or, in the alternative, motion for remittitur because the verdict is contrary to the weight of the evidence; there is no substantial evidence that Ms. Davis was guilty of comparative fault greater than 50%; and where the damage amount awarded by the jury is not supported by the evidence. We begin our analysis of this issue by noting that Tennessee follows the "thirteenth juror" rule, "which requires the trial court to grant a motion for a new trial if the court disagrees with the finding of the jury." Banks and Entman, Tennessee Civil Procedure (2nd ed. 2004) § 12-2(h). Under this rule, "[w]hen a party moving for a new trial asserts that the verdict is contrary to the weight of the evidence, it is the trial court's duty to independently weigh the evidence, to determine whether it preponderates against the verdict, and if so, to order a new trial." *Id.* In its capacity as thirteen jury, the trial court may not reallocate findings of fault, but may only order a new trial. *Id.*

In this case, the trial court's order clearly reflects that it exercised its role as thirteenth juror and concluded that the evidence preponderated in favor of the jury verdict. In light of our analysis of the issue above, we cannot say the trial court erred with respect to the question of negligence or percentage of fault. There is material evidence in this case to support the jury's determination that Ms. Davis was 51% at fault in this case. We turn, therefore, to Ms. Davis's assertion that the trial court erred in failing to grant her alternative motion for remittitur.

Section 20-10-102 of the Tennessee Code provides:

(a) In all jury trials had in civil actions, after the verdict has been rendered, and on motion for a new trial, when the trial judge is of the opinion that the verdict in favor of a party should be reduced, and a remittitur is suggested by the trial judge on that account, with the proviso that in case the party in whose favor the verdict has been rendered refuses to make the remittitur a new trial will be awarded, the party in

whose favor such verdict has been rendered may make such remittitur under protest, and appeal from the action of the trial judge to the court of appeals.

(b) The court of appeals shall review the action of the trial court suggesting a remittitur using the standard of review provided for in Rule 13(d) of the Tennessee Rules of Appellate Procedure applicable to decisions of the trial court sitting without a jury. If, in the opinion of the court of appeals, the verdict of the jury should not have been reduced, but the judgment of the trial court is correct in other respects, the case shall be reversed to that extent, and judgment shall be rendered in the court of appeals for the full amount originally awarded by the jury in the trial court.

Tenn. Code Ann. § 20-10-102 (1994).

The Code further provides, in pertinent part,

(a) If the judgment of the trial court, with regard to a remittitur, is affirmed in the court of appeals, so that a party is required to make a remittitur or suffer a new trial, as in the judgment of the trial court, or if, by the opinion of the court of appeals, a further or a larger remittitur is required of the party in whose favor the verdict was rendered, or if after the case was tried in the lower court by the trial judge without a jury, or if after the case was tried in the lower court with a jury and no remittitur was suggested by the trial judge, a remittitur is first suggested or required in the court of appeals, on penalty of granting a new trial; then in each and all of these events the party in whose favor the verdict or judgment has been rendered may make the remittitur under protest in the court of appeals, and take the case, by application for permission to appeal, for review upon that point, to the supreme court.

Tenn. Code Ann. § 20-10-103 (1994).

The determination of damages in a personal injury case is within the province of the jury. *Grandstaff v. Hawks*, 36 S.W.3d 482, 499 (Tenn. Ct. App.2000). Trial courts may suggest adjustments to the jury's award of damages when they believe them to be inadequate (suggesting additur) or excessive (suggesting remittitur). *Coffey v. Fayette Tabular Prods.*, 929 S.W.2d 326, 331 (Tenn.1996). In a personal injury or wrongful death action, compensatory damages may include economic and non-economic damages. Non-economic damages include "pain and suffering, permanent impairment and/or disfigurement, and loss of enjoyment of life-both past and future." *Overstreet v. Shoney's*, Inc., 4 S.W.3d 694, 715 (Tenn. Ct. App.1999). Damages for pain and suffering include both the physical and mental discomfort caused by an injury. *Id.*

Appellate courts review a trial court's decision regarding remittitur under the standard of review set forth in Tennessee Rules of Appellate Procedure 13(d), presuming the court's finding to be correct unless the evidence preponderates otherwise. *Coffey*, 929 S.W.2d at 331. Appellate courts may suggest a remittitur where the trial court has not. *Id.* However, our authority is "more circumscribed" than that of the trial court. *Id.* Where the trial court, in its role as thirteenth juror,

has approved a jury verdict, that verdict will not be disturbed where there is any material evidence to support it. *Id.* n. 2. We must, therefore, review the evidence in this case to determine whether material evidence supports a finding that the jury award is within the range of reasonableness and not excessive. *See Hand v. Norfolk So. Ry. Co.*, No. 03A01-9704-CV-00123, 1998 WL 281946, at *11 (Tenn. Ct. App. June 2, 1998) *perm. app. denied* (Tenn. Nov. 2, 1988).

The parties in this case have stipulated to medical damages in the amount of $1894.40 and to funeral expenses in the amount of $4337.32. Additionally, Ms. Dunn's expert, Dr. David Ciscel (Dr. Ciscel), testified to lost earnings in the amount of $645,000. Dr. Ciscel testified that this amount represented "the present value of the income he (Jeremias) would have earned as a worker had he survived," and reflected earning capacity less deductions for personal consumption reduced to present value. Dr. Ciscel's additional testimony that Jeremias's lost income had he received a college degree would have been $960,000 drew objection from counsel for Ms. Davis, who objected on the grounds that the projection was not included in discovery material. The trial court sustained the objection, and instructed the parties that it would either provide a curative instruction or declare a mistrial. Counsel for the parties agreed to a curative instruction, and the trial court instructed the jury to disregard Dr. Ciscel's testimony regarding what Jeremias could have earned had he pursued a college degree. No further evidence was offered by either party regarding pecuniary damages. The jury assessed total general compensatory damages in the amount of $1,250,000.

In her brief to this Court, Ms. Davis suggests that where the evidence of economic damages was limited to $651,231.72, damages in excess of this amount could only be non-economic damages for pain and suffering.[2] Ms. Davis asserts that, although pain and suffering might be inferred in this case, Ms. Dunn offered no evidence to suggest that Jeremias was conscious after impact and that "[n]o medical testimony presented gave rise to any proof of pain and suffering." Ms. Davis asserts that the damage award was, therefore, contrary to the jury instruction that "first class" damages included "the mental and physical suffering actually endured by Dunn." Ms. Davis also asserts that, although plaintiffs are not required to introduce expert proof of a conclusive dollar value of a decedent's life, the evidence in this case was conclusive.

Ms. Dunn, on the other hand, does not address Ms. Davis's assertion that damages in excess of $651,231.72 are non-economic damages for pain and suffering. Rather, Ms. Dunn contends that the jury's award of damages was based on the jury's measure of the value of Jeremias's life considering his background, health, and personal habits. Ms. Dunn cites *Thrailkill v. Patterson*, 879 S.W.2d 836 (Tenn. 1994), and this Court's unpublished opinion in *Bradford v. Swain*, 1989 WL 1221, for the proposition that it is within the jury's discretion to assign a value to a human life in excess of the pecuniary evidence introduced at trial. Ms. Dunn asserts that Dr. Ciscel's testimony establishes merely a floor minimum value for work-life loss. Ms. Dunn contends that Dr. Ciscel's testimony and the testimony of Jeremias's school principal, Mr. George Cole (Mr. Cole), who

---

[2]It is undisputed that the trial court granted Ms. Davis's motion for directed verdict regarding Ms. Dunn's loss of consortium claims. Ms. Dunn has not appealed this order.

testified that Jeremias was a special child, serious, mature, and an honor student, constitute material evidence to support the jury award.

In *Thrailkill*, the central issue before the supreme court was whether this Court had properly remitted the jury award. *Thrailkill*, 879 S.W.2d at 836-837. In that medical malpractice action, plaintiff, decedent's husband, sued defendant-physicians alleging that defendants negligently failed to diagnose and treat decedent for pre-eclampsia, a medical condition associated with pregnancy. *Id.* Plaintiff alleged that defendants' negligence was the proximate cause of the death of his wife, then thirty-three years of age and pregnant with her first child. *Id.* The supreme court determined that liability had been clearly established, and that material evidence supported the jury's award of damages. *Id.*

The *Thrailkill* court noted that Tennessee's wrongful death statutes provide for recovery of damages arising from mental and physical pain and suffering, "loss of time, and necessary expenses resulting to the deceased from personal injuries." *Id.* at 841 (citing Tennessee Code Annotated §§ 20-5-106, 20-5-107, 20-5-113; T. A. Smedley, "Wrongful Death Actions in Tennessee, 27 Tenn.L.Rev. 447 (1960)). The court stated:

> [t]his recovery is based upon the pecuniary value of the life of the deceased to be determined upon a consideration of his life, his age, condition of health and strength, capacity for labor and for earning money through skill in any art, trade profession, and occupation or business.

*Id.* (citations omitted). The *Thrailkill* court further noted that, under Tennessee Code Annotated § 20-5-113, damages recoverable in a wrongful death action consist of two classes. *Id.* (quoting *Wilkerson v. Altizer*, 845 S.W.2d 744, 749 (Tenn. App. 1992)). The first class of damages is "damages purely for injury to the deceased," which include damages for mental and physical pain and suffering, for loss of time, and for "necessary expenses resulting to the deceased from personal injury." *Id.* The second class of damages includes "incidental damages suffered by the next of kin from the death. These incidental damages include the pecuniary value of the life of the deceased." *Id.* (citations omitted). The *Thrailkill* court held that the measure of the husband's recovery in that case for the second class of damages was

> the pecuniary value of the life of the wife to the husband, and not what wages the wife might have been able to earn, nor merely what it would have taken to hire another to do the work she did, as such basis of recovery would overlook the value of the wife's personal interest in the affairs of the home.

*Id.*

As Ms. Dunn submits, the *Thrailkill* court reiterated that "the assessment of damages is not governed by fixed rules of mathematical precision, but the matter is left to the sound discretion of the jury." *Id.* (citations omitted). The court affirmed that the

amount of damages in a death action is a matter dependent most largely upon the judgment of the jury and their sound discretion after carefully, honestly and fairly considering all various elements that enter into the question," and that "since no rule exist[s] by which to measure the value of a life, the jury is in the best position to assess damages and, next to the jury, the trial judge is in the best position to evaluate damages; and great weight must be given to the judgment of the jury and the trial judge in the absence of any showing of misconduct.

*Id.* at 841-842 (citations omitted).

However, the *Thrailkill* court reversed this Court's suggestion of remittitur not on the basis of pecuniary value of the decedent's life, but because the court determined that sufficient evidence was introduced in that case to warrant damages on the basis of pain and suffering. *Id.* at 842. The court noted that, in *Hall v. Nash*, 184 Tenn. 312, 198 S.W.2d 649 (1947), it "held that whether the decedent lived a few minutes after the accident so as to have suffered any pain as to authorize an award of damages was a question for the jury." *Id.* The court observed that the evidence in *Thrailkill* demonstrated that "the decedent died four days after her cesarean operation; and proof was presented regarding her pain and suffering both prior to and after her operation." Id.

In *Bradford v. Swain*, another medical malpractice action, the jury awarded plaintiff damages in the amount of $1,000,000 arising from the death of plaintiff's minor child. *Bradford v. Swain*, 1989 WL 1221, at *2 (Tenn. Ct. App. Jan. 13, 1989). In *Bradford*, this Court noted that the five factors are to be considered in determining the pecuniary value of a life: life expectancy, age, health, earning capacity, and personal habits. *Id.* at *4 (citing *Bellamy v. Sadler*, 640 S.W.2d 29 (Tenn. Ct. App. 1982). We further noted that

it is not necessary that any witness should express an opinion of the amount of . . . pecuniary loss, it being proper for the jury to exercise their own judgment upon the facts proved, by connecting them with their own knowledge and experience which they are supposed to possess in common with the generality of mankind.

*Id.* at *5 (quoting *Crowe v. Provost*, 374 S.W.2d 645, 654 (Tenn. 1963)). The plaintiff in *Bradford* offered no expert testimony regarding the pecuniary value of the decedent's life and no testimony regarding expected earning capacity. *Id.* at *5. However, we held that the jury could reasonably conclude that the decedent would have an earning capacity of at least minimum wage between the ages of sixteen and sixty-five, and that pecuniary damages of approximately $328,300 were reasonable. *Id.* at *5. Additionally, we observed that, even where the child has no history of earnings, "substantial damages" may be awarded for the death of a minor based solely on life expectancy, age, health and personal habits. *Id.* at *6. Upon review of the record in that case, we determined that the verdict was not completely supported by material evidence, and we suggested a remittitur in the amount of $400,000. *Id.*

In the present case, Ms. Dunn offered no evidence of pain and suffering.  The only medical evidence in the record is the deposition of Dr. Barry Gilmore (Dr. Gilmore), the attending physician who cared for Jeremias at LeBonheur Hospital following the accident.  Dr. Gilmore testified that EMS incident report entered into evidence stated that, although Jeremias was alive when paramedics arrived at the scene of the accident at 3:09 pm, he was "totally unresponsive."  He further testified that when the ambulance left the scene at 3:31, Jeremias had no pulse and was not breathing.  Dr. Gilmore stated that there was nothing to indicate that Jeremias was conscious when the paramedics arrived, and that Jeremias's "skull was open to the outside" and that brain matter was leaking from it.  Ms. Dunn does not argue in her brief that the jury award was based on pain and suffering, and Ms. Dunn failed to demonstrate that Jeremias was conscious after the accident.  Accordingly, we agree with Ms. Davis that there is no material evidence in this case to support an award in excess of $651,231 based on pain and suffering.

We likewise find no material evidence exists in this case to support a verdict based on a pecuniary value in excess of $645,000.  Unlike *Bradford*, this case includes expert testimony, and that testimony evidences that the pecuniary value of Jeremias life was likely to have been $645,000.  This amount reflected Jeremias's likely earning capacity reduced to present value, less a deduction for personal consumption.  Additionally, Dr. Ciscel, Ms. Dunn's expert, testified that he in reaching this determination he considered "the quality of his (Jeremias's) school experience" and the fact that Jeremias was a good student; that Jeremias's "conduct was good"; that "he had a family that cared about him."  As noted above, following objection by defense counsel, the trial court specifically instructed the jury to disregard Dr. Ciscel's testimony regarding what Jeremias was likely to have earned had he pursued a college degree.  Mr. Cole's testimony that Jeremias was an honor student and, in essence, a "good kid" reinforces Dr. Ciscel's testimony, but does little to evidence additional pecuniary damages.  Ms. Dunn offered no other proof regarding damages.  Thus, in this case, the record evidences that the expert determination of pecuniary value based on earning capacity was based not only on minimum wage expectations, but in consideration of Jeremias's personal habits, life expectancy, and health.

We are not insensitive to the fact that, in a larger sense, it is impossible to prove with mathematical precession the value of a life.  We also are not insensitive to the fact that no amount of money can compensate Ms. Dunn for the loss of her son.  Within the framework of the court system, however, the plaintiff bears the burden of demonstrating damages with some material evidence.  There is no material evidence in this case to support an economic damage award in excess of $651,231.72.  We accordingly remand with a suggestion of remittitur in the amount of $598,768.

### *Admission of Evidence*

We turn next to Ms. Davis's assertion that the trial court erred in admitting a photograph of Jeremias taken some years prior to the accident, in admitting the testimony of Ms. Dunn's expert accident reconstructionist, Dr. Williams, and in excluding an excerpt of a letter from Ms. Dunn's legal counsel to Dr. Williams.  We afford the trial court wide discretion regarding the admissibility of evidence and will not overturn the trial court's determination absent a clear abuse of that

discretion. *Tire Shredders, Inc. v. ERM-North Central, Inc.*, 15 S.W.3d 849, 857 (Tenn. Ct. App. 1999).

Ms. Davis asserts the trial court erred in admitting, over Ms. Davis's objection, a photograph of Jeremias tendered through the testimony of Mr. Cole. Ms. Davis contends "[t]he photograph served no relevant purpose, was inaccurate, and served only to arouse the sympathy of the jury." Ms. Davis's objection, as we understand it, was that the photograph did not accurately reflect Jeremias's age at the time of the accident and was prejudicial in light of the question of whether Jeremias was old enough to appreciate the danger of crossing Union Avenue. We cannot say the trial court abused its discretion in admitting what appears to have been the most recent available photograph of Jeremias. Additionally, even assuming the photograph was of little probative value, it clearly did not prejudice the jury in light of the apportionment of fault in this case.

We likewise find no abuse of discretion in the admission of Dr. Williams' testimony. Ms. Davis's argument, as we perceive it, is that Dr. Williams testimony with respect to the perception-reaction time of Ms. Davis, which he estimated at approximately 1.5 seconds, is unreliable where perception-reaction time comprises a range of time. The transcript of the trial reflects that Dr. Williams testified that the range of perception-reaction time was 1 to 1.5 seconds, however, and Dr. Williams was thoroughly cross-examined on this issue. We find no error in the admission of Dr. Williams' testimony; its weight was a matter properly before the jury.

Finally, we find no abuse of discretion in the trial court's refusal to admit an excerpt of a letter between Ms. Dunn's legal counsel and Dr. Williams. Ms. Davis submits the excerpt was admissible to demonstrate that Dr. Williams' testimony was biased by counsel's professed desire to place Jeremias within the crosswalk at the time of the accident. We observe, first, that Dr. Williams was cross-examined regarding his role as plaintiff's expert and that any possible bias with respect to his testimony was clearly before the jury. Second, we note that the trial court agreed to admit the letter in its entirety. This issue is without merit.

### *Discretionary Costs*

Ms. Davis submits the trial court erred in awarding Ms. Dunn discretionary costs in the amount of $13,659.52. Ms. Davis asserts that Ms. Dunn claims expert and deposition expenses for matters not necessary for trial in contravention of Tennessee Rules of Civil Procedure 54. Ms. Davis asks this Court to remand the issue to the trial court for further analysis.

As Ms. Davis notes, an award of discretionary costs is within the discretion of the trial court and the appellant bears the burden of demonstrating that the trial court abused its discretion. In her brief to this Court, however, Ms. Davis does nothing more than state that the trial court abused its discretion in awarding costs not recoverable under the rules. She has not carried her burden to identify with particularity costs that allegedly were not recoverable. We affirm the award of discretionary costs to Ms. Dunn.

*Holding*

In light of the foregoing, this matter is remanded to the trial court with a suggestion of remittitur in the amount of $598,768, resulting in a total damage award of $651,232 and a judgment in favor of Ms. Dunn in the amount of $332,128.32, plus discretionary costs in the amount of $13,659.52. The judgment of the trial court is otherwise affirmed. Costs of this appeal are taxed one-half to the Appellee, Jennifer Dunn, and one-half to the Appellant, Amelia Davis, and her surety, for which execution may issue if necessary.

_____
DAVID R. FARMER, JUDGE